1   COOLEY LLP
    TERESA MICHAUD (296329)
2   (tmichaud@cooley.com)
    SARA VICTORIA M. PITT (317611)
3   (sporter@cooley.com)
    355 South Grand Avenue, Suite 900
4   Los Angeles, California  90071
    Telephone:    +1 213 561 3250
5   Facsimile:    +1 213 561 3244

6   WHITTY SOMVICHIAN (194463)
    (wsomvichian@cooley.com)
7   AUDREY J. MOTT-SMITH (300550)
    (amottsmith@cooley.com)
8   KELTON N. MURPHY (340366)
    (kbasirico@cooley.com)
9   3 Embarcadero Center, 20th Floor
    San Francisco, California  94111-4004
10  Telephone:    +1 415 693 2000
    Facsimile:    +1 415 693 2222

11

12  Attorneys for Defendant
    GOOGLE LLC

13

14              UNITED STATES DISTRICT COURT

15      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

16

17  IN RE: GOOGLE PLAY STORE              Case No. 5:21-md-03001-EJD
    SIMULATED CASINO-STYLE GAMES
18  LITIGATION                           **DEFENDANT GOOGLE LLC'S NOTICE OF
                                         MOTION AND MOTION TO DISMISS**
19
                                         Date:      March 7, 2025
20                                       Time:      9:00 a.m.
                                         Dept:      4
21                                       Judge:     Hon. Edward J. Davila

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

I.      INTRODUCTION ............................................................................................................ 1

II.     FACTUAL BACKGROUND .......................................................................................... 3

     A.    The Google Play Store. ...................................................................................... 3

     B.    The Third-Party Apps. ........................................................................................ 3

III.    LEGAL STANDARD ...................................................................................................... 4

IV.    ARGUMENT .................................................................................................................... 5

     A.    Section 230 Provides a Complete Defense to All of Plaintiffs' Claims. ............... 5

          1.    Where a plaintiff's theory of liability requires treating the defendant as a publisher or speaker of third-party content, Section 230 immunity applies. ................................................................................. 5

          2.    Section 230 applies because Google's liability to Plaintiffs would require treating it as the publisher or speaker of the Third-Party Apps' content. ........................................................................ 10

               a.    Plaintiffs' Loss Recovery claims are barred. .............................. 11

                    (i)    Treating the payment processing transactions as gambling contracts would require treating Google as a publisher of the Third-Party Apps' content.................... 11

                    (ii)    Many of Plaintiffs' Loss Recovery claims are additionally barred because Google is not a "winner." .................................................................................... 14

                    (iii)   Plaintiffs' RICO claims similarly cannot survive. ........... 16

               b.    Plaintiffs' consumer protection claims are barred. ...................... 18

               c.    Plaintiffs' claims for unjust enrichment are barred....................... 19

     B.    Plaintiffs' California Claims (Counts I and II) Should Be Dismissed. ................. 20

          1.    California public policy prohibits civil recovery for alleged gambling losses. ....................................................................................... 20

          2.    Counts I and II additionally fail on their merits........................................ 20

               a.    Plaintiffs lack UCL standing.......................................................... 20

     C.    Plaintiffs Lack Statutory Standing to Bring Consumer Protection Claims Under Seven Additional States (Counts IV, VII, X, XIII, XX, XXV, XLI)......... 22

     D.    Plaintiffs Cannot State a Claim Under Multiple States' Loss Recovery Statutes Because Google is not a "Winner" (Counts VI, IX, XII, XV, XXIV, XXVII, XXIX, XXXI, XXXIII, XXXV, XXXVII, & XL). .................... 23

     E.    Plaintiffs Fail to State a Claim Under RICO (Counts XLIII and XLIV). ............. 24

          1.    Plaintiffs lack standing to bring RICO claims. ........................................ 25

          2.    Plaintiffs have not alleged a RICO enterprise or Google's conduct in it. ........................................................................................................... 26

**TABLE OF CONTENTS**
(continued)

**Page**

      3.    Plaintiffs' claim under Section 1962(d) additionally fails because Plaintiffs did not allege a conspiracy. ........................................................ 28

V.     CONCLUSION ............................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramowitz v. Tropicana Atl. City Corp.*,
    750 F. App'x 109 (3d Cir. 2018) .................................................................... 23

*Adell v. Macon Cnty. Greyhound Park, Inc.*,
    785 F. Supp. 2d 1226 (M.D. Ala. 2011) ........................................................ 26

*Alan Neuman Prods, Inc. v. Albright*,
    862 F.2d 1388 (9th Cir. 1988).......................................................................... 25

*Alves v. Players Edge, Inc.*,
    2007 WL 6004919 (S.D. Cal. Aug. 8, 2007) .................................................. 28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................. 4, 12

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009)..................................................................*passim*

*Baumer v. Pachl*,
    8 F.3d 1341 (9th Cir. 1993)............................................................................. 28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................... 14

*BMA LLC v. HDR Glob. Trading Ltd.*,
    2021 WL 949371 (N.D. Cal. Mar. 12, 2021) ................................................. 26

*Boyle v. U.S.*,
    556 U.S. 938 (2009)......................................................................................... 26

*Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*,
    112 F.4th 1168 (9th Cir. 2024) ....................................................................*passim*

*Calise v. Meta Platforms, Inc.*,
    103 F.4th 732 (9th Cir. 2024) ......................................................................*passim*

*Chaset v. Fleer/Skybox Int'l, LP*,
    300 F.3d 1083 (9th Cir. 2002)................................................................... 25, 26

*Cisneros v. Petland, Inc.*,
    972 F.3d 1204 (11th Cir. 2020)....................................................................... 27

*Coffee v. Google, LLC*,
    2022 WL 94986 (N.D. Cal. Jan. 10, 2022) ................................................. 6, 21

COOLEY LLP
ATTORNEYS AT LAW
DOWNTOWN LOS ANGELES

**GOOGLE LLC'S MOTION TO DISMISS**
**5:21-MD-03001-EJD**

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,

4

2012 WL 10731957 (C.D. Cal. June 29, 2012) ................................................................ 27

5

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) ........................................................................................... 8

6

*Dumas v. Major League Baseball Props., Inc.*,

7

104 F. Supp. 2d 1220 (S.D. Cal. 2000) ........................................................................... 25

8

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,

9

751 F.3d 990 (9th Cir. 2014) .......................................................................................... 26

10

*Evans v. Hewlett-Packard Co.*,
2013 WL 4426359 (N.D. Cal. Aug. 15, 2013) ................................................................ 14

11

*In re Facebook Simulated Casino-Style Games Litig.*,

12

2024 WL 2287200 (9th Cir. May 21, 2024) ................................................................... 10

13

*Fair Hous. Council v. Roommates.com, LLC*,

14

521 F.3d 1157 (9th Cir. 2008) .......................................................................................... 6

15

*Fayer v. Vaughn*,
649 F.3d 1061 (9th Cir. 2011) .......................................................................................... 4

16

*Gardner v. Starkist Co.*,

17

418 F. Supp. 3d 443 (N.D. Cal. 2019) ........................................................................... 26

18

*Gillespie v. Schomaker*,

19

191 F. Supp. 8 (E.D. Ky. 1961) ...................................................................................... 24

20

*Gomez v. Guthy-Renker, LLC*,
2015 WL 4270042 (C.D. Cal. July 13, 2015) ................................................................ 28

21

*Gonzalez v. Google LLC*,

22

2 F.4th 871 (9th Cir. 2021) ............................................................................................... 9

23

*Green v. Aztar Corp.*,
2003 WL 22012205 (N.D. Ill. Aug. 22, 2003) ............................................................... 25

24

25

*Hardin v. NBC Universal, Inc.*,
660 S.E.2d 374 (Ga. 2008) ............................................................................................. 11

26

*Hennessy v. Gap, Inc.*,

27

86 F.4th 823 (8th Cir. 2023) ........................................................................................... 22

28

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) .................................................................................. 6, 9, 13

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Humphrey v. Viacom, Inc.*,
2007 WL 1797648 (D.N.J. June 20, 2007) ............................................................. 12, 15, 24

*Jacobs v. KRM Wagering LLC*,
2023 WL 3397511 (Ky. Ct. App. May 12, 2023) ............................................................. 23

*In re Jamster Mktg. Litig.*,
2009 WL 1456632 (S.D. Cal. May 22, 2009) ............................................................. 27

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liabl. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020) ............................................................. 27

*Kelly v. First Astri Corp.*,
72 Cal. App. 4th 462 (1999) ............................................................. 20

*Kim v. Carter's Inc.*,
598 F.3d 362 (7th Cir. 2010) ............................................................. 22

*Klayman v. Zuckerberg*,
753 F.3d 1354 (D.C. Cir. 2014) ............................................................. 5

*Konik v. Time Warner Cable*,
2010 WL 11549435 (C.D. Cal. July 19, 2010) ............................................................. 21

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021) ............................................................. 9

*Lynn v. Fort McClellan Credit Union*,
2013 WL 5707372 (N.D. Ala. Oct. 21, 2013) ............................................................. 22

*Mai v. Supercell Oy*,
648 F. Supp. 3d 1130 (N.D. Cal. 2023) ............................................................. 21

*Manning v. v. Creative Headquarters, LLC*,
2012 U.S. Dist. LEXIS 191219 (N.D. Ill. Mar. 30, 2012) ............................................................. 24

*Mason v. Mach. Zone, Inc.*,
140 F. Supp. 3d 457 (D. Md. 2015) ............................................................. 21

*In re MasterCard Int'l Inc. Internet Gambling Litig.*,
132 F. Supp. 2d 468 (E.D. La. 2001) ............................................................. 17

*N.H. Lottery Comm'n v. Rosen*,
986 F.3d 38 (1st Cir. 2021) ............................................................. 17

*Perrin v. United States*,
444 U.S. 37 (1979) ............................................................. 23

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Peterson v. Cellco P'ship*,
 164 Cal. App. 4th 1583 (2008) ................................................................................... 21

*Phillips v. Double Down Interactive LLC*,
 173 F. Supp. 3d 731 (N.D. Ill. 2016) ........................................................ 12, 15, 16, 24

*Prager Univ. v. Google LLC*,
 2018 WL 1471939 (N.D. Cal. Mar. 26, 2018) ................................................................ 4

*Price v. Pinnacle Brands, Inc.*,
 138 F.3d 602 (5th Cir. 1998) ...................................................................................... 26

*Rae v. Union Bank*,
 725 F.2d 478 (9th Cir. 1984) ...................................................................................... 24

*Reves v. Ernst & Young*,
 507 U.S. 170 (1993) .................................................................................................... 28

*Romano v. Torch Elecs., LLC*,
 2023 WL 9064602 (W.D. Mo. Aug. 21, 2023) ............................................................ 25

*Salinas v. United States*,
 522 U.S. 52 (1997) ...................................................................................................... 28

*Sanford v. MemberWorks, Inc.*,
 625 F.3d 550 (9th Cir. 2010) ...................................................................................... 24

*Schwartz v. Upper Deck Co.*,
 104 F. Supp. 2d 1228 (S.D. Cal. 2000) ...................................................................... 26

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
 473 U.S. 479 (1985) .................................................................................................... 25

*Shaw v. Nissan N. Am., Inc.*,
 220 F. Supp. 3d 1046 (C.D. Cal. 2016) ...................................................................... 27

*Small v. Savannah Int'l Motors, Inc.*,
 275 Ga. App. 12 (2005) .............................................................................................. 22

*Spears v. Stewart*,
 283 F.3d 992 (9th Cir. 2001) ........................................................................................ 9

*Taylor v. Apple, Inc.*,
 2021 WL 11559513 (N.D. Cal. Mar. 19, 2021) .......................................................... 21

*Toomey v. Penwell*,
 245 P. 943 (Mont. 1926) ...................................................................................... 11, 13

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*U.S. v. Turkette,*
  452 U.S. 576 (1981) ........................................................................................... 27

*Van Patten v. Vertical Fitness Grp., LLC,*
  847 F.3d 1037 (9th Cir. 2017) ....................................................................... 20, 22

*In re W. Va. Rezulin Litig.,*
  214 W. Va. 52 (2003) ........................................................................................ 23

*Wagh v. Metris Direct Servs., Inc.,*
  348 F.3d 1102 (9th Cir. 2003) ........................................................................... 25

**Statutes**

18 U.S.C.
  § 1084 ........................................................................................................... 16, 17
  § 1955 ........................................................................................................... 16, 17
  § 1955(a) ............................................................................................................ 17
  § 1962(c) ....................................................................................................... 24, 28
  § 1962(d) ............................................................................................................ 28
  § 1964(c) ....................................................................................................... 24, 25

47 U.S.C.
  § 230 ........................................................................................................... *passim*
  § 230(c)(1) ................................................................................................... 5, 6, 19
  § 230(e)(3) ........................................................................................................... 5

California Penal Code
  § 330b ................................................................................................................. 18
  § 330.1 ............................................................................................................... 18

**Other Authorities**

Federal Rule of Civil Procedure
  9(b) ..................................................................................................................... 25
  12(b)(6) ............................................................................................................. 1, 4
  12(c) ................................................................................................................. 1, 11

COOLEY LLP
ATTORNEYS AT LAW
DOWNTOWN LOS ANGELES

1

**NOTICE OF MOTION AND MOTION TO DISMISS**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE THAT, on March 7, 2025, at 9:00 a.m., or as soon thereafter as

4

the matter may be heard, before the Honorable Edward J. Davila, at the United States District Court

5

for the Northern District of California, San Jose Division, 280 South 1st Street, 5th Floor,

6

Courtroom 4, San Jose, California, 95113, Defendant Google LLC ("Google") will and hereby does

7

move this Court to dismiss Plaintiffs' Amended Master Complaint (the "Complaint") in its entirety.

8

This Motion is based on the accompanying Memorandum of Points and Authorities, the

9

concurrently filed Declaration of Teresa Michaud and Request for Judicial Notice, any other written

10

or oral argument submitted in connection with this Motion, the prior pleadings and orders in this

11

action, and any other materials properly before the Court.  Google additionally expressly

12

incorporates and joins in the arguments raised in Defendants Apple and Meta's concurrently filed

13

motions to dismiss.  Google brings this Motion without waiver or limitation of its right to bring any

14

other motion under Federal Rule of Civil Procedure 12(c).

15

Google seeks an order dismissing the Complaint pursuant to Federal Rule of 12(b)(6) for

16

failure to state a claim.  Google also requests that the Court take judicial notice of Exhibit 1 attached

17

to the Michaud Declaration.

18

**MEMORANDUM OF POINTS AND AUTHORITIES**

19

**I.    INTRODUCTION**

20

This multidistrict litigation cannot proceed because, once the conduct protected by Section

21

230 of the Communications Decency Act ("Section 230") is stripped away from Plaintiffs'

22

allegations, no allegations sufficient to state a claim against Google remain.  The Ninth Circuit has

23

made clear that the applicability of Section 230 must be considered on a claim-by-claim basis,

24

according to the duties each cause of action creates.  This Court has already correctly held that any

25

effort to hold Google liable for hosting or promoting the "social casino" apps—and "working with

26

developers to increase user engagement to drive revenue"—is barred by Section 230.  Under this

27

Court's ruling, the only activity that remains that can possibly be the basis for Plaintiffs' claims is

28

Google's role processing payments for third-party in-app content (what Plaintiffs deem "virtual

chips") in transactions that happen separate from and *before* any Plaintiff decides if and how to use the chips in the third-party app that offered them for sale. Therefore, on remand, the only question this Court must answer to determine if Section 230 precludes Plaintiffs' claims is whether, by engaging in the payment processing activity alone—considered independently from the gaming apps' content and regardless of what, if anything, Plaintiffs choose to do with their "chips"—Google violated the duties imposed by various states' loss recovery statutes and consumer protection laws. It did not. Google did not enter any gambling contracts, retain any gambling losses, win from any gambling game, or deceive Plaintiffs about processing payments for them, per their requests. *Google's conduct* is the same whether an app sells "chips" for purported gambling or some other form of in-app content related to, for example, cookie-baking, and is unconnected to any subsequent decision a user makes about how to use the third-party content she purchased. Given that fact, to hold Google liable would require treating it as the publisher or speaker of the third-party gaming apps' content. Section 230 prohibits this, and the Court should resolve this motion by dismissing the Complaint in its entirety.

If, for some reason, the Court declines to dismiss under Section 230, it should nevertheless dismiss Plaintiffs' claims on the merits as a matter of law. *First*, California public policy precludes recovery for gambling losses and, regardless, Plaintiffs lack statutory standing under California's Unfair Competition Law, dooming Counts I and II. *Next*, seven of Plaintiffs' remaining eight consumer protection claims (counts IV, VII, X, XIII, XX, XXV, and XLI) likewise fail because Plaintiffs have not pled any actionable damage or loss. *Additionally*, twelve of Plaintiffs' sixteen loss recovery claims (counts VI, IX, XII, XV, XXIV, XXVII, XXIX, XXXI, XXXIII, XXXV, and XL) are barred because Plaintiffs have not, and cannot, allege that Google is a "winner" of any of the games Plaintiffs chose to play after their transactions with Google concluded. *Finally*, Plaintiffs' RICO claims (counts XLIII and XLIV) cannot survive because, again, Plaintiffs lack statutory standing and additionally did not plead facts to support required elements of their claims. Thus, if the Court does not dismiss the Complaint in its entirety under Section 230, it can nevertheless dismiss Plaintiffs' claims.

## II.    FACTUAL BACKGROUND

For efficiency, Google does not repeat the procedural history of this case, which is laid out in detail in Apple's concurrently filed motion to dismiss and, instead, explicitly incorporates by reference that presentation of the procedural history here.

### A.    The Google Play Store.

Google owns and operates Google Play, through which users can download mobile applications or "apps" to mobile devices that run on the Android Operating System.  (Compl. ¶¶ 47, 53.)  Third party developers create and submit apps to offer on Google Play, which publishes those apps in accordance with its publicly available content policies.  (*Id*. ¶ 78.)  Among the apps available through Google Play are the 50 casino-style gaming apps that Plaintiffs challenge (the "Third-Party Apps" or "Apps").  (*Id*. ¶ 74.)

Google offers every app developer the same set of content neutral tools.  These include: an array of analytics tools to help developers understand how their apps are downloaded and used (*id*. ¶¶ 70, 72); "App Campaigns" for developers who wish to advertise their content (*id*. ¶ 85); and various "promotional activities," including coupons and credits (*id*. ¶ 86).  In addition, if the developers choose to offer virtual content for sale through their apps, Google offers a payment processing service for those transactions.  (*Id*. ¶ 61.)  Plaintiffs do not allege that the payment processing service Google offers is unique to the Third-Party Apps, as it is not.

### B.    The Third-Party Apps.

Plaintiffs allege they each downloaded one or more of the Apps through Google Play.  (*See, e.g., id*. ¶¶ 104, 107.)  Although Plaintiffs admit each App may contain many different games, including slot titles, card game titles, and bingo titles (*id*. ¶ 54), Plaintiffs do not allege which specific titles are available in any of the Third-Party Apps—or even indicate the breakdown of the *types* of titles available within them, with one exception: the Double Down Casino App contains 186 slot titles, 21 card game titles, and 1 bingo title (*id*. ¶ 54).  To play the slot titles, players receive "an initial allotment of virtual chips for free[,]" (*id*. ¶ 58), which they can then use to "'spin' the slot machine."  (*Id*. ¶ 57.)  Once they use this allotment, the App developers "alert the player that he or she has insufficient funds to continue playing" (*id*. ¶ 59), and a player "ha[s] three options":

(1) stop playing; (2) wait for the App developer to provide them with more free chips; or (3) purchase more chips (*id*. ¶ 60). If a player opts to buy more chips, the App developers offer "chip packages" for sale in an in-game store. (*Id*.) As with any app available on Google Play that offers virtual content for sale, these developers can use Google's payment processing services for those in-app transactions—in this case, purchases of virtual chips. (*Id*. ¶ 61.) "Google collects the money players spend on virtual chips," keeps a portion of the proceeds for itself, and "remits the rest to the" developers. (*Id*.) ***After*** players purchase chips, they can choose to use those chips, if at all, to "(1) place wagers on slot machine spins; (2) place wagers on the few card game or bingo titles in the Illegal Slots app, or (3) give a 'gift' of virtual chips to another account in the app." (*Id*. ¶ 63.) In each case, a player will interact further with the App—but in no case will Google play any part in what the player does (or does not do) with their virtual chips. A player cannot use chips outside of the App in which she purchased them. (*Id*.)

If players choose to use chips to play the "animated slot machines" within the Third-Party Apps, they "choos[e] the amount they wager on each spin" (*id*. ¶ 58) and can "win" more virtual chips, which they can then use to keep playing (*id*. ¶ 3). Plaintiffs contend that the App developers "tailor 'wins' and 'losses'[,]" including with "dynamic paytables" to "maximize addiction" (*id*. ¶¶ 65-68), and use "paid marketing" strategies and "***internally-developed*** analytic tools" to further their business objectives (*id*. ¶ 72 (emphasis added)). Plaintiffs do not, however, allege that ***Google*** has any involvement in designing or contributing to these gameplay dynamics. Nor do Plaintiffs allege that Google participates in gameplay, in any way, including should a player decide to "wager" chips. These omissions in Plaintiffs' allegations highlight that Google's involvement stops the moment after it processes a payment for a player's in-app purchase.

## III.    LEGAL STANDARD

To survive a motion under Rule 12(b)(6), Plaintiffs must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Prager Univ. v. Google LLC*, 2018 WL 1471939, at *3 (N.D. Cal. Mar. 26, 2018) (quoting *Fayer v. Vaughn*, 649

F.3d 1061, 1064 (9th Cir. 2011)).    Additionally, Section 230 requires dismissal where the defendant's entitlement to immunity is "evident from the face of the complaint." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014).

## IV.  ARGUMENT

### A.    Section 230 Provides a Complete Defense to All of Plaintiffs' Claims.

As this Court has already recognized, Section 230 prohibits claims against an internet service provider that treat the provider "as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  (*See* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Pursuant to Section 230 of the Communications Decency Act ("Order"; Dkt. No. 80).)  "This robust immunity applies to '(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.'" *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1176 (9th Cir. 2024) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009)).[1]  Only the second prong is at issue here: whether Plaintiffs seek to treat Google as a publisher or speaker of the Third-Party Apps' content. (*See* Order at 12; *see also* Plaintiffs' Consolidated Opposition to Motions to Dismiss Under Section 230 of the Communications Decency Act ("Opposition" or "Opp."; Dkt. No. 70) at 9 ("the ***sole issue*** before the Court is whether Plaintiffs' claims inherently require the court to treat the Platforms as the publisher or speaker of content provided by another.") (quotations omitted) (emphasis added).)[2]  And, pursuant to this Court's Order, the only conduct the Court has not already held is immune under Section 230 is Google's role processing payments for third-party in-app content. (*See* Order at 31–35 (allowing Plaintiffs to move forward only on their "revenue-based" theory).)

#### 1.    Where a plaintiff's theory of liability requires treating the defendant as a publisher or speaker of third-party content, Section 230 immunity applies.

"Under the second prong [of the *Barnes* test], the Court must determine whether Plaintiffs'

---

[1] Where it applies, Section 230 preempts inconsistent state laws.  *See* 47 U.S.C. § 230(e)(3).

[2] Even if that were not the case, as explained in Google's prior briefing, prongs one and three are also met.  (*See* Google's Motion to Dismiss (Dkt. No. 69) at 7-11.)

allegations show that Plaintiffs seek to treat Google as a publisher or speaker with respect to content on the Google Play store." *Coffee v. Google, LLC*, 2022 WL 94986, at *5 (N.D. Cal. Jan. 10, 2022) (citing *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1170 (9th Cir. 2008) (en banc); *see also Yolo*, 112 F.4th at 1176 ("The second *Barnes* prong considers whether the cause of action alleged in the complaint seeks to plead around the CDA's strictures and treat the defendant as a 'publisher or speaker' of third-party content."). "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates*, 521 F.3d at 1170-71. "What matters is not the name of the cause of action . . . [but] whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1101–02. A platform "acts as a publisher" and is immune under Section 230 "when it decides whether or not to post online material submitted for that purpose by a third party." *Coffee*, 2022 WL 94986, at *5.

The Ninth Circuit has repeatedly held that assessing the second prong "requires courts to examine each claim to determine whether a plaintiff's *theory of liability* would treat a defendant as a publisher or speaker of third-party content. To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker. If it does, § 230(c)(1) precludes liability." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 740 (9th Cir. 2024) (internal quotations and citations omitted) (emphasis in original); *see also, e.g.*, *Yolo*, 112 F.4th at 1177 (same). Only "where the duty springs ***from another source***—for example, a contract—[is] the plaintiff [] not seeking to hold the defendant as a publisher or speaker and § 230 does not apply." *Calise*, 103 F.4th at 740 (emphasis added).

The Ninth Circuit recently clarified this duty analysis at the heart of the second prong. To ascertain whether the duty the plaintiff alleges the defendant violated is tied to the defendant's role as a publisher, a court must (1) determine the "'right' from which the duty springs[,]" *Calise*, 103 F.4th at 742—*i.e.*, does it "spring" from the platform's status as a publisher or "from something separate from the defendant's status as a publisher, such as from an agreement?"—and (2) ask "***what is this duty requiring the defendant to do***? If it obliges the defendant to 'monitor third-party content'—or else face liability—then that too is barred by § 230(c)(1)." *Id.* (citing *HomeAway.com*,

*Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) (emphasis added)); *see also Yolo*, 112 F.4th at 1177 (identifying the same "two-step analysis").

Embracing this approach, the court in *Calise* held that the plaintiffs' claims for negligence, unjust enrichment, and under California's unfair competition law (the UCL), all of which were based on allegations that Meta profited from "scam advertisements," were barred by Section 230. 103 F.4th at 743–44. The court found that each of those claims "involve[d] a similar duty: the duty to prevent fraud by third parties." *Id.* at 743. Because that duty required Meta to "actively vet and evaluate third party ads . . . to avoid liability" it derived from Meta's status as a publisher or speaker and Section 230 applied. *Id.* at 743–44. Conversely, the *Calise* court held that contract claims could go forward because those, unlike the others, relied on "'enforceable promises' allegedly made by Meta" creating "a contractual duty separate from [Meta's] status as a publisher." *Id.* at 742–43.

Similarly, just this past August, in *Yolo¸* the Ninth Circuit affirmed the district court's dismissal of multiple product liability claims, where the plaintiffs there alleged that the defendant's app was "inherently dangerous because of its anonymous nature[.]" 112 F.4th at 1179. In *Yolo*, plaintiffs alleged that "it was negligent for YOLO to ignore the history of teen suicides stemming from cyberbullying on anonymous apps[,]" such that YOLO should face liability based on negligent design and failure to warn theories—theories that plaintiffs claimed all stemmed from duties arising separate from YOLO's status as a publisher of third-party content. *Id.* at 1174, 1180. But the court disagreed, holding that, "[a]t root, all Plaintiffs' product liability theories attempt[ed] to hold YOLO responsible for users' speech or YOLO's decision to publish it." *Id.* at 1180. As to negligent design, the court reasoned: "What is that harm but the harassing and bullying posts of others?" *Id.* As to failure to warn, the court explained that that claim "faults YOLO for not mitigating, in some way, the harmful effects of the harassing and bullying content[,]" concluding that "[t]his is essentially faulting YOLO for not moderating content in some way[.]" *Id.* Thus, the Ninth Circuit held that Section 230 precluded plaintiffs' claims. *Id.* at 1182.[3]

---

[3] The court allowed misrepresentation claims, since those sought "to hold YOLO accountable for a promise . . . and not for failure to take certain moderation actions." 112 F.4th at 1178.

The Ninth Circuit's recent application of Section 230 in *Calise* and *Yolo* is consistent with prior Ninth Circuit decisions addressing the limited circumstances in which a platform hosting third-party content incurs a duty that **relates** to that content but nonetheless springs from a source **separate** from the platform's status as a publisher.

Starting with *Barnes*, there, the plaintiff alleged that her ex-boyfriend posted nude images of her on a fake profile he created on the defendant, Yahoo's, website. 570 F.3d at 1098-99. Barnes contacted Yahoo to have the images removed, and Yahoo promised to take them down. *Id.* When it did not, Barnes sued, bringing claims for negligent undertaking and promissory estoppel. The Ninth Circuit found that Barnes's negligent undertaking claim boiled down to alleging that Yahoo "failed to perform with due care" by not "remov[ing] [] the indecent profiles." *Id.* at 1102-03. But because "removing content is something publishers do . . . impos[ing] liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove." *Id.* Thus, Section 230 barred this claim. By contrast, Barnes's promissory estoppel claim sprung from Yahoo's **independent** promise to plaintiff to remove the offending material. Although that promise "happen[ed] to be removal of material from publication[,]" (*id.* at 1107) it created a distinct (contractual) obligation. In other words, for that claim, Barnes did not seek to hold Yahoo liable as a publisher or speaker of third-party content, but rather as party to a contract. *Id.*

Next, in *Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016), a plaintiff brought a negligent failure to warn claim against the defendant, a networking website for models, for failing to warn users of a conspiracy that was known to the site separate from its publishing function. *Id.* at 848-49. The Ninth Circuit reversed the district court's dismissal under Section 230 because the defendant's knowledge of the rapists' predatory use of its site, unrelated to monitoring content, created a duty to warn unrelated to the defendant's status as a publisher; the duty was borne out of an **independent** obligation—not an obligation to "remove any user content or [that] otherwise affect[ed] how [the site] publishe[d] or monitor[ed] such content." *Id.* at 851; *accord Bride*, 112 F.4th at 1181.

Subsequently, in *HomeAway*, the Ninth Circuit held that Section 230 did not shield home-sharing platforms from liability for processing transactions for unregistered properties where the

relevant city ordinance specifically prohibited them from completing such transactions. 918 F.3d at 682. Importantly, by proscribing platform-level transactions for unregistered properties, the ordinance did ***not*** require the platforms to monitor third-party listings on their sites to determine if those listings featured unregistered properties. *Id.* Instead, the city provided a separate registry of properties the platforms could cross-reference before processing a transaction. Thus, compliance with the ordinance only required ***consulting the registry***. The court distinguished this duty (to process payments for only registered properties) from one that would "necessarily require an internet company to monitor third-party content[,]" and found that Section 230 did not apply. *Id.*

Finally, in *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), plaintiffs sought to hold the defendant, Snapchat, liable for the negligent design of its product, which included a speed filter that allowed users to overlay their speeds on "snaps" and thereby encouraged young drivers to drive dangerously. *Id.* at 1091–92. Unlike the product design-based claims in *Yolo*, the product design in *Lemmon* was dangerous all on its own. At issue there were allegations that Snap "negligently design[ed] a product (Snapchat) with a defect (the interplay between Snapchat's reward system and the Speed Filter)"—a defect that created an unreasonable risk of harm regardless of the content of users' "snaps." *Id.* at 1092. Thus, "the duty that Snap allegedly violated 'spr[ang] from' its distinct capacity as a product designer"—not its role as publisher of third-party content. *Id.*; *accord Bride*, 112 F.4th at 1180 (explaining that the claim in *Lemmon* did not depend on third-party content).[4]

---

[4] After *Lemmon*, the Ninth Circuit decided *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), which the Supreme Court vacated, (598 U.S. 617 (2023)), and that decision is no longer binding on this Court. *See Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2001) (*see* Dkt. No. 111). Indeed, neither *Calise* nor *Yolo* include *Gonzalez* in the overview of Circuit precedent on the second prong of the *Barnes* test. Thus, to rely on *Gonzalez* to conclude that the Ninth Circuit has articulated a broad revenue-sharing exception to Section 230 immunity (*see* Order at 29), untethered to and at odds with the duty analysis elucidated in *Calise* and *Yolo*, would be error. Regardless, Gonzalez does not create a general revenue sharing exception to Section 230 immunity, but instead addresses a statute making it unlawful to give money to government-designated terrorists, a duty very

The line the Ninth Circuit has drawn is clear.  As *every one* of the above cases demonstrates, a defendant is only unable to avail itself of Section 230 immunity for failure to satisfy the second prong of *Barnes* if it could have fulfilled the duty the plaintiff alleges it violated *without* having to review (or edit or exclude) third-party content.  In none of the decisions bearing on this question has the Ninth Circuit articulated a general revenue-sharing or payment processing-based bar to immunity.  Instead, putting these cases together, what matters is identifying the duty plaintiffs allege a defendant violated and resolving whether finding a violation would require treating the defendant as the publisher or speaker of a third party's content.

### 2. Section 230 applies because Google's liability to Plaintiffs would require treating it as the publisher or speaker of the Third-Party Apps' content.

Following this Court's Order, the only conduct of Google that could create liability under any of Plaintiffs' causes of action is its role providing a general-purpose payment processing service for in-app content.  (*See* Order at 31-35; *see also e.g.*, Compl. ¶ 179.)  Plaintiffs assert three categories of claims under various states' (1) gambling loss recovery statutes[5] and (2) consumer protection laws, and for (3) unjust enrichment.  While the specifics of each state law vary (in material ways), for purposes of unearthing the *duties* they create for the Section 230 analysis, Google addresses them in groups.  This is consistent with the Ninth Circuit's direction for a "claim-specific analysis" that identifies "the underlying legal duty" the claims create.  *In re Facebook Simulated Casino-Style Games Litig.*, 2024 WL 2287200, at *2 (9th Cir. May 21, 2024).  The Ninth Circuit's ruling—and the case law summarized above—make clear that the question for the Court is not whether revenue-sharing in the abstract is protected by Section 230 but, instead, whether the particular duties imposed by the claims at issue require treating Google, in its role sharing revenue, as a publisher of the Third-Party Apps, including by compelling Google to monitor those Apps to avoid liability.  For the reasons below, they do.

---

different from the duties implicated by Plaintiffs' theories in this case.

[5] Google includes Plaintiffs' RICO claims in this category because those claims rely on California Penal Code sections addressing illegal slot machines and lotteries.  (*See* Compl. ¶¶ 553, 558.)

a.    **Plaintiffs' Loss Recovery claims are barred.**[6]

(i)    **Treating the payment processing transactions as gambling contracts would require treating Google as a publisher of the Third-Party Apps' content.**

Setting aside for present purposes that Plaintiffs have failed to state a claim under each of the loss recovery statutes at issue, including as laid out below,[7] Plaintiffs still face an unsurmountable threshold barrier: to recover under all these statutes, a plaintiff must have ***gambled*** and ***lost***.  Indeed, the duty created by each is ***not to enter a gambling contract or retain gambling losses***.  But, at the time Plaintiffs purchased third-party in-app content using Google's payment processing services, nothing even arguably constituting gambling had occurred: Plaintiffs had not played any game, made any bet or wager, or lost anything—certainly not to Google.  The only way to find that Google violated any purported duty regarding gambling activity would be to require Google to review the Apps' content and to hold Google responsible for Plaintiffs' subsequent engagement with that content.  That is barred by Section 230.

To enter a "gambling contract" requires a transaction "supported by a 'gambling consideration,'" meaning "the parties in effect stipulate that they shall ***gain or lose*** upon the happening of an . . . event[.]"  *Hardin v. NBC Universal, Inc.*, 660 S.E.2d 374, 375 (Ga. 2008) (analyzing Georgia's loss recovery statutes) (emphasis added).  In other words, parties must agree that who will walk away with the money is uncertain and contingent upon the outcome of a specific known event.  *See, e.g.*, *Toomey v. Penwell*, 245 P. 943, 945 (Mont. 1926) (applying Montana's loss recovery statute and explaining that "[i]n a wager or bet there must be two parties," and it is not known "before the chance or uncertain event upon which it is laid is accomplished" which of those parties will win and which will lose); *Wager*, Black's Law Dictionary (12th ed. 2024) (a

---

[6] The text of each state's loss recovery statute is included in Google's Appendix, filed herewith and cited herein by reference to Appendix chart rows as "App'x A at R. __."

[7] Consistent with its prior representations and this Court's acknowledgment, Google omits individual state-by-state arguments and explicitly reserves the right to raise such arguments in subsequent motion practice under Rule 12(c).  (Sept. 19, 2024 Hr'g Tr. 34:18–36:11; 47:16-48:18.)

"wager" is "[m]oney or other consideration risked on an uncertain event; a bet or gamble" or "[a] promise to pay money or other consideration on the occurrence of an uncertain event.").  Here, no money ever hung in the balance or depended on the outcome of any event *with Google*.  Plaintiffs paid Google a set amount for the opportunity to purchase third-party in-app content to engage further with the Third-Party Apps.  (*See, e.g.*, Comp. ¶¶ 60–62.)  Plaintiffs' transaction with Google was not a bet or a wager.  And, crucially, by making a payment for in-app content, Plaintiffs did not *lose*: the purpose of purchasing the in-app content was to interact with the games, which is exactly what Plaintiffs got to do—meaning they received precisely what they paid for.  *See Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 741 (N.D. Ill. 2016) (holding the plaintiff bought and was able to use the chips so "she did not 'lose' the value of those chips.").

What's more, as Plaintiffs admit, once purchased, they could use the in-app content (here, virtual chips) to interact with the Apps in *various ways*: they could "place wagers on slot machine spins," "place wagers on . . . card game or bingo titles[,]" or "give a 'gift' of virtual chips to another account in the app."  (Compl. ¶ 63.)[8]  But each of these further actions—some not alleged to be gambling—require further engagement between Plaintiffs and the *content* of the Third-Party Apps; *Google is not involved* in that, except by generally publishing the Apps.  Thus, not only were the payments Google processed not bets, wagers, or losses, such that they could not plausibly be considered "gambling consideration" or "gambling losses," they were distinct from any gambling transaction that might have occurred between Plaintiffs and the Apps.  At the time Google processed Plaintiffs' payments, Google did no more than accept valid consideration in exchange for allowing Plaintiffs to purchase third-party in-app content, something that merely provided Plaintiffs the privilege of engaging further with the games.  *See, e.g.*, *Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *7 (D.N.J. June 20, 2007) (payment of an entry fee to fantasy sports sites "is not wagering, betting or staking money [under New Jersey's loss recovery statute] . . .  Defendants

---

[8] Plaintiffs allege that "[s]ubstantially all virtual chips are used on slot machine spins" but provide no factual support for this conclusion, entitling it to no weight.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("mere conclusory statements[] do not suffice" to state a claim).

are neutral parties in the fantasy sports games—they do not compete for the prizes and are indifferent as to who wins the prizes. Defendants simply administer and provide internet-based information and related support services for the games."); *Toomey*, 245 P. at 945 (an entrance fee that gave the plaintiff the privilege to participate in a horse race was not a gambling transaction). No gambling transaction with Google was consummated, and whether one ever would be (which Google contests), was up to Plaintiffs and entirely outside of Google's visibility or control—***unless Google undertook to monitor third-party content and how it is used***.

A comparison to *HomeAway* is illustrative. As discussed in Section IV(A)(1) above, there, a payment processing transaction was also at issue. However, unlike here, the statutory duty at issue in that case was simply not to engage in that precise transaction—a duty not to facilitate bookings for unregistered real-world properties. *HomeAway*, 918 F.3d at 682. Here, in contrast, the duty created by the loss recovery statutes is not to engage in a gambling transaction or retain gambling losses. *See e.g.*, App'x A at R. 1 (Alabama: "All contracts founded in whole or in part on a gambling consideration are void."); R. 3 (Georgia: "Gambling contracts are void"); R. 4 (Illinois: "Any person who by gambling shall lose . . .). Google does not do that, and to hold otherwise would require reaching into the future to hold Google responsible for the third-party content Plaintiffs purchased and how they used that content within the environment of particular Third-Party Apps. That would make Google responsible for the content of the games with which Plaintiffs subsequently engaged, and it would impose liability based on Google's failure to monitor the content of those Apps. Thus, finding that Google violated the duty imposed by the loss recovery statutes would require treating Google as a publisher or speaker of third-party content. In *HomeAway*, the defendants could have satisfied their duty without "review[ing] the content provided by the hosts of listings on their websites." *HomeAway*, 918 F.3d at 682. That is simply not the case here. To prevent Plaintiffs from allegedly entering gambling contracts would "oblige[] the defendant to monitor third-party content—or else face liability[.]" *Calise*, 103 F.4th at 742 (internal quotations and citation omitted). Section 230 bars this result.

Plaintiffs try to avoid this inevitable conclusion with a sleight of hand, arguing that Google was somehow directly involved in the alleged gambling by acting as a "bookie" who engaged in

"bookmaking conduct—*i.e.*, booking illegal gambling transactions."  (Opp. at 10-11.)  But a plaintiff must allege "more than labels and conclusions[,]"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), and, here, Plaintiffs plead no facts to support their conclusion that Google was a "bookmaker."  A bookmaker is a professional betting man who takes bets from many people on different sporting events and then distributes money to the winners.  *Bookmaker*, Black's Law Dictionary (12th ed. 2024) (a "bookie" or "bookmaker" is "[s]omeone who determines odds and receives bets on the outcome of events, esp. sports events, and pays out to winners.").  As explained above, Google does not take **bets**, set **odds**, or, upon the conclusion of some event, **determine the winner** of a bet, much less distribute money accordingly.  Plaintiffs do not plead otherwise.  Rather, Google simply processes a neutral transaction where it provides in-app content for set consideration; that is nothing like the role of a "bookie."[9]

The absurdity of Plaintiffs' position is underscored by Plaintiffs' implicit admission on appeal that, were Google to "offer app[s] for sale in [an] app store[,]" in that case, they would be immune under Section 230.  *See* Plaintiffs-Appellees' Consol. Principal and Response Brief, *In re Google Play Store Simulated Casino-Style Games Litig.*, No. 22-16921 (9th Cir. Oct. 25, 2023), Dkt. No. 44, at 31 (citing *Evans v. Hewlett-Packard Co.*, 2013 WL 4426359, at *3 (N.D. Cal. Aug. 15, 2013)).  But it makes no difference under either Section 230 or the underlying loss recovery statutes whether Plaintiffs pay to access third-party content when they download an App or on an a la carte basis after the initial download.  In neither case is that payment even colorably a gambling transaction that occasioned gambling losses and, in **both cases**, to consider it one would require treating Google as a publisher or speaker of the Third-Party Apps with which users subsequently interact.  Both theories are barred by Section 230.

> **(ii)    Many of Plaintiffs' Loss Recovery claims are additionally barred because Google is not a "winner."**

---

[9] Notably, Plaintiffs do not allege that the payment processing service Google provides for the Apps differs from what it offers other app developers (*i.e.*, Plaintiffs have not pled that Google's payment processing service is anything but a neutral tool).  On Plaintiffs' theory, the only reason Google's activity is unlawful is because of the content of those Apps.

Although the Court's analysis need go no further, a substantial subset of the loss recovery statutes giving rise to Plaintiffs' claims additionally only allow losers to recover from a "winner."[10] Plaintiffs acknowledge this fact. (*See, e.g.*, Compl. ¶¶ 208 (alleging, in connection with their claim under the Georgia loss recovery statute, that Google is a 'winner' of each transaction"); 236 (same for Illinois); 266 (same for Kentucky).) Thus, for these twelve statutes, the duty the statutes create is narrower: not to retain gambling losses you won from another. To be a "winner," Google must have participated in the games and ***had a stake*** in their outcome. Plaintiffs have not—and cannot— plead either. Plaintiffs' allegation that "Google has profited and continues to profit from each payment made by Georgia Class Members to purchase virtual coins, and therefore is the 'winner' of each transaction" (Compl. ¶ 208) does not change this reality.[11]

Instead, as explained in Section IV(A)(2)(a)(i) above, the pleadings make clear that Google simply processed a neutral transaction for in-app content and received a set amount of consideration that it would keep ***no matter what happened*** in any subsequent third-party game a user chose to play. Google did not participate in any game, have a stake in the outcome, or even know what games Plaintiffs played. Indeed, courts have held that even the game developers themselves cannot be "winners" because a developer "keeps the money a player pays to buy additional chips no matter whether that player wins or loses in the games[;] that money is never put at risk." *Phillips*, 173 F. Supp. 3d at 740 ("Because no amount of earned money ever hangs in the balance or depends on the outcome of a game, Double Down is not a 'winner' under the Illinois Loss Recovery Act."). The same rationale applies with even greater force to Google, who neither created nor controls the games. *See also Humphrey*, 2007 WL 1797648, at *9 ("Defendants [fantasy sports sites] plainly

---

[10] These include the loss recovery statutes for Georgia, Illinois, Kentucky, Minnesota, New Jersey, New York, Ohio, Oregon, South Carolina, Virginia, Washington and West Virgina, implicating claims VI, IX, XII, XV, XXIV, XXIX, XXXI, XXXIII, XXXV, XXXVII, and XL. (*See* App'x A at Rs. 3, 4, 6, 7, 11, 13–20.)

[11] Plaintiff restates the same allegation as to the other eleven loss recovery statutes that only allow for recovery from winners. (*See* Compl. ¶¶ 236, 266, 292, 372, 402, 418, 437, 454, 471, 491, 524.)

are not 'winners' as a matter of law [under New Jersey's loss recovery statute], but merely parties to an enforceable contract. . . [and a]t no time do Defendants participate in any bet"). Thus, Google cannot be a winner. Trying to treat it as such would require the Court to ascribe to Google a role in the Third-Party Apps it did not have: the Court could only find Google violated the duty at issue by impermissibly treating Google as the publisher or speaker of those Apps.[12]

> **(iii)    Plaintiffs' RICO claims similarly cannot survive.**

As further explained in Section IV(E) below, Plaintiffs' RICO claims fail for multiple reasons. But even assuming Plaintiffs had plausibly pled those claims (which they have not done), finding Google violated the duties those laws impose would require treating Google as a publisher or speaker. Plaintiffs rely on 18 U.S.C. § 1084, which creates a duty not to transmit wagering information, and 18 U.S.C. § 1955, which creates a duty not to "conduct, finance, manage, supervise, direct, or own all or part of an illegal gambling business" (cleaned up) as defined by state

---

[12] Although the case law interpreting the "winner" requirement in many of the other states is sparse or absent, the statutory language permitting recovery only from winners in the Georgia, Minnesota, Ohio, South Carolina, Virginia, and West Virginia loss recovery statutes is substantially similar to that in Illinois, and the same reasoning articulated in the *Phillips* case applies. (App'x A at Rs. 3, 7, 14, 16, 18, 20.) New York allows for recovery from winners or "the stakeholder or other person in whose hands shall be deposited any such wager" (App'x A at R. 13.) and Kentucky allows for recovery from winners or "any transferee of the winner, having notice of the consideration" (App'x A at R. 6 (emphasis added)). Google is not a stakeholder or transferee of a winner because the money it retains precedes any possible wager and, thus, the existence of a winner. Additionally, to "have notice of" the gambling consideration would require monitoring the third-party content and users' subsequent engagement with it. Finally, Oregon and Washington allow recovery from winners or "proprietor[s] for whose benefit such game was played or dealt" (App'x A at Rs. 15, 19), but Google cannot be said to be a proprietor. (*See* Proprietor, Merriam-Webster, https://www.merriam-webster.com/dictionary/proprietor ("A person who has the legal right or exclusive title to something: owner"). (*See also* App'x A at R. 19.)

1     law.  (*See* Compl. ¶¶ 552-554.)

2          As a threshold issue, Section 1084 only concerns "sporting event[s] or contest[s]" and

3     simply does not apply.  *See, e.g.*, *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 61-62 (1st Cir. 2021)

4     (Section 1084(a) "appl[ies] only to the interstate transmission of wire communications related to

5     any 'sporting event or contest.'"); *In re MasterCard Int'l Inc. Internet Gambling Litig.*, 132 F.

6     Supp. 2d 468, 480 (E.D. La. 2001), aff'd, 313 F.3d 257 (5th Cir. 2002) ("[A] plain reading of the

7     statutory language clearly requires that the object of the gambling be a sporting event or contest.").

8     But even setting that aside, as explained in Section IV(A)(2)(a)(i) above, at the time Google

9     processes the payment transaction at issue, no wager has plausibly occurred: plaintiffs have simply

10    used Google's payment processing services to purchase in-app content, for known and certain

11    consideration, that allows them to then interact further with the Third-Party Apps.  To the extent a

12    wager ***ever*** occurs, it occurs only later in a subsequent transaction in which Google has no part.

13    Thus, Google is not capable of transmitting "wagering information"—and so has not and cannot

14    violate the duty not to transmit wagering information unless treated as the publisher or speaker of

15    the Third-Party Apps.

16         As to the second, Section 1955 by its clear terms imposes a duty only on those who run

17    gambling businesses.  Plaintiffs' own allegations make clear that Google is nothing more than a

18    "host platform[.]"  (Compl. ¶ 572.)  Google does not "conduct, finance, manage, supervise, direct,

19    or own" the Third-Party Apps, 18 U.S.C. § 1955(a) (cleaned up)—not least of which because,

20    again, nothing even arguably constituting gambling has occurred at the time Google processes the

21    payment transaction.  In fact, all the supposed racketeering activity to which Plaintiffs point (*e.g.*,

22    "[d]eveloping illegal slot machine[s]", "[d]istributing and operating" those machines, and

23    "[c]oncealing the scope and deceptive nature" of them (Compl. ¶ 572)) is activity undertaken only

24    by the Third-Party App developers.  To hold Google liable for violating the duty imposed by

25    Section 1955 would, thus, run afoul of this Court's prior Order and require putting Google in the

26    shoes of the third-party developers and holding Google responsible for the content they create.  (*See*

27    Order at 32-35.)  Section 230 prohibits this result.

28

1          **b.      Plaintiffs' consumer protection claims are barred.**

2          The gravamen of the various consumer protection statutes under which Plaintiffs bring

3   claims is to protect against deceptive practices in consumer transactions.  (App'x B at Rs. 1, 2, 5,6,

4   7, 8, 9, 11, 12.)  Thus, the duty those statutes create is one not to ***deceive, mislead, or make false***

5   ***promises to consumers*** in connection with trade or commerce.  But Plaintiffs do not allege that

6   ***Google*** did anything deceptive (or made any misleading statements) in processing the requested

7   transactions for Plaintiffs that form the basis of their sole remaining theory of liability.  Nor could

8   they.  Plaintiffs sought to purchase in-app content, Google processed the transaction, and Plaintiffs

9   received the content for which they paid.  (Compl. ¶¶ 60-62.)  Indeed, Plaintiffs have not alleged

10  that Google made a single representation about the payment processing transaction—let alone one

11  that deceived them.  Plaintiffs' allegations, instead, are limited to conduct by third parties, including

12  that ". . . social casinos tailor 'wins' and 'losses' in such a way as to maximize addiction," using

13  "dynamic paytables."  (*Id*. ¶¶ 65-68.)  Notably, Plaintiffs do not—and cannot—plead that Google

14  had any role in designing how the Third-Party Apps set wins or losses, so to hold Google

15  responsible for that purported conduct, the Court would have to treat Google as a publisher or

16  speaker of another's content.  *See, e.g.*, *Calise*, 103 F.4th at 742 (dismissing consumer-protection

17  claims premised on "the duty to prevent fraud by third parties").

18         A few of the statutes at issue more broadly proscribe conduct that is "unfair" or "unlawful"

19  in addition to that which is deceptive or fraudulent.  (App'x B at Rs. 2, 11, 12.)  However, in each

20  case, Plaintiffs' basis for pleading unfair or unlawful conduct is one or more state laws that make

21  ***gambling*** illegal.  Again, when the payment processing transactions take place, no gambling has

22  occurred.  Plaintiffs have not made "wagers", "stake[d] or risk[ed] something of value," or placed

23  any "bet."  (*See* Compl. ¶¶ 154-155, 500, 531 (alleging violations of California, Washington, and

24  West Virginia consumer protection statutes based on state laws that define illegal gambling, in part,

25  as betting, wagering, or staking or risking a thing of value).)[13]  Rather, Plaintiffs have simply

26  _____

27  [13] To the extent Plaintiff relies on the prohibitions against manufacturing, owning, storing, keeping,

28  possessing, etc. slot machines in California Penal Code Sections 330b and 330.1 (*see* App'x B at

purchased in-app content from developers for a fee, which they may then use as they like—they have engaged in a routine commercial exchange.  To hold Google responsible for Plaintiffs' subsequent engagement with third-party content, would "oblige[] [Google] to 'monitor third-party content'—or else face liability—[and] that too is barred by § 230(c)(1)." *Calise*, 103 F.4th at 742.[14]

### c.    Plaintiffs' claims for unjust enrichment are barred.

Plaintiffs' claims for unjust enrichment are all based on the same foundational allegation that Plaintiffs placed "wager[s]" in the Third-Party Apps (*see* Compl. ¶¶ 167, 197, 225, 254, 281, 298, 315, 344, 361, 390, 407, 424, 443, 460, 477, 513, 542 ("As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiffs . . . by virtue of their purchase of virtual coins from Google ***to wager in social casinos*** . . .")) and, therefore, must be dismissed under Section 230 for the same reasons as Plaintiffs' loss recovery claims.  (*See* Section IV(A)(2)(a), *supra*.)  As *Calise* makes clear, unjust enrichment claims are barred by Section 230 where, as here, they seek return of a benefit flowing from the publication of third-party content, where "to avoid liability" the defendant "would need to actively vet and evaluate third party" material.  103 F.4th at 744.

---

R. 3; Compl. ¶¶ 154-155), Plaintiffs make no allegations to this effect—only that Google "host[s] and facilitat[es]" the games developed and offered by the Third-Party Apps.  (Compl. ¶ 143.) Hosting third party content on a neutral platform is paradigmatic exempt conduct under Section 230 and, construing "facilitating" to reference Google's payment processing (the only conduct alleged still at issue), that conduct is also exempt as described above.

[14] While the other consumer protection statutes on which Plaintiffs rely include the words "unconscionable" or "unfair" in connection with describing the conduct they preclude (*see* App'x B at Rs. 1, 5-9, 11, 12), reference to the full statutory text makes clear that their focus remains ferreting out fraud and deception in consumer transactions.  Regardless, Plaintiffs have not alleged how the payment processing transactions are "unconscionable" or "unfair."  (*See* Compl. ¶¶ 190, 218, 247, 274, 332, 334, 378, 380.)

**B.      Plaintiffs' California Claims (Counts I and II) Should Be Dismissed.**

Even if Section 230 did not shield Google (which it does), the Complaint still fails to state a claim under California law both because (1) California public policy prohibits plaintiffs from recovering gambling losses through civil litigation and (2) Plaintiffs have failed to plead the elements required under the UCL, including any conduct that could give rise to their additional claim for unjust enrichment.

**1.      California public policy prohibits civil recovery for alleged gambling losses.**

While Google disputes that the Third-Party Apps violate California gambling laws (*see* Section IV(B)(2)(b) below), even accepting Plaintiffs' theory, the Court must nonetheless dismiss Counts I and II because California law does not confer statutory civil standing for claims to recover lost bets and has, instead, adopted a "strong, broad, and long-standing public policy against judicial resolution of civil disputes arising out of gambling contracts or transactions." *Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462, 476-77, 489 (1999). For efficiency, Google joins and incorporates by reference the arguments raised by Meta in its concurrently filed motion at Section IV(A)(2).

**2.      Counts I and II additionally fail on their merits.**

**a.      Plaintiffs lack UCL standing.**

To have statutory standing under the UCL, Plaintiffs must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice . . . that is the gravamen of the claim." *Van Patten v. Vertical Fitness Grp.*, *LLC*, 847 F.3d 1037, 1048-49 (9th Cir. 2017) (citation omitted). Plaintiffs have done neither.

***First***, Plaintiffs fail to allege they suffered an economic injury. As a threshold matter, each Plaintiff only generically alleges they spent money in the games but does not specify on which titles (*see, e.g.,* Compl. ¶ 63) or to what end (*e.g.*, on chips they then used for slot spins, or on something else (*id.* ¶ 63)). Without more, it is impossible to know if Plaintiffs spent any money within the titles they contend are unlawful. But even assuming Plaintiffs had pled precisely what they purchased, for how much, and for what later purpose they used it, Plaintiffs still have not pled an economic injury because they received precisely what they bargained for: a number of virtual chips

for a set fee, to use however they pleased.  (Compl. ¶¶ 3, 60, 63.)  Plaintiffs do not allege they received fewer coins than they sought to purchase or that the coins were defective and, where plaintiffs "receive[] the benefit of the[ir] bargain", they lack UCL standing.  *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1591 (2008).  Courts in this Circuit (and others applying California law) regularly confirm that mobile game players fail to establish UCL standing where their only "injury" is having exchanged real money for virtual currency for a virtual game.  *See, e.g.*, *Mai v. Supercell Oy*, 648 F. Supp. 3d 1130, 1134 (N.D. Cal. 2023) (no UCL standing where they "d[id] not allege a deficiency in the loot boxes or virtual currency that they received in exchange for their real-world currency . . . Nor do they allege that they received a lesser amount of [virtual currency] than they were promised."), *aff'd*, 2024 WL 2077500, at *2 (9th Cir. May 9, 2024); *Coffee v. Google, LLC*, 2022 WL 94986, at *8 (N.D. Cal. Jan. 10, 2022) (no loss for purposes of UCL standing where plaintiff "obtained exactly the virtual currency [he] paid for"); *Taylor v. Apple, Inc.*, 2021 WL 11559513, at *4-5 (N.D. Cal. Mar. 19, 2021) (no "economic injury" because plaintiff "obtained exactly what he paid for —virtual currency that he was free to use as he wished in the game"; players do not buy virtual currency—not "freely convertible back into cash"—"for the prospect of economic gain"); *Mason v. Mach. Zone, Inc.*, 140 F. Supp. 3d 457, 464-65 (D. Md. 2015) (no UCL standing where plaintiff "was not wagering with *dollars*" but "acquired 'gold' in the 'gold store,' where she exchanged her real-world currency for a nontransferable, revocable license to use virtual currency for entertainment purposes. At the moment of that antecedent transaction, Plaintiff's 'loss,' if any, was complete[.]") (citation omitted, emphasis in original).

    ***Second***, even if Plaintiffs' alleged "loss" could confer standing (it does not), that loss does not flow from ***Google's*** conduct, separately dooming Plaintiffs' bid to establish UCL standing.  *See Konik v. Time Warner Cable*, 2010 WL 11549435, at *5 (C.D. Cal. July 19, 2010) (the challenged conduct must be "an immediate cause of [their] injury-producing conduct.").  Google's only conduct that remains at issue is its role processing payments for in-app content.  (Compl. ¶¶ 8, 61, 92; Order at 35.)  But, as the Complaint makes clear, that act of payment processing is divorced from Plaintiffs' later decision to play a slot or lottery title within any game.  As alleged, the games involve two distinct transactional steps: (1) players "navigate to an electronic store and purchase

chip packages" with real money; and then (2) choose how to use their chips within the games. (Compl. ¶¶ 60-63.)  Plaintiffs do not allege that processing payments for the sale of virtual currency is itself illegal, nor could they.  Instead, they take issue with the **second** transaction—a transaction exclusively between the players and game developers.  In fact, Plaintiffs concede they had at least three options after they purchased virtual chips, including two they do not allege constitute "illegal gambling" at all (playing non-slot titles and gifting virtual chips).  (Compl. ¶ 63.)  And Plaintiffs do not allege which option **they** chose.  (*See, e.g., id.* ¶¶ 104-106.)  Thus, Plaintiffs' "loss" (paying money for virtual chips) cannot be described as a gambling loss, as it is a wholly separate transaction from the alleged "illegal gambling", meaning the "loss" was not "caused by the unfair business practice," *Van Patten*, 847 F.3d at 1048-49.  Thus, Plaintiffs lack UCL statutory standing.

### C.    Plaintiffs Lack Statutory Standing to Bring Consumer Protection Claims Under Seven Additional States (Counts IV, VII, X, XIII, XX, XXV, XLI).

As is the case with Plaintiffs' UCL claims (*see* Section IV(B)(2)(a), *supra*), Plaintiffs' fail to allege statutory standing and, thus, cannot state a claim under the consumer protection laws of Alabama, Georgia, Illinois, Kentucky, Missouri, New Jersey, and West Virginia.

**First**, under each of the above states' laws other than Kentucky, Plaintiffs have not pled actionable damage or loss.  In each state (like in California), where a plaintiff receives the benefit of her bargain—as here, where Plaintiffs do not claim they received fewer or lower-quality chips than that for which they paid (*see, e.g.*, Compl. ¶¶ 61–62; Section IV(B)(2)(a), *supra*)—there is no "actual" or "monetary" damage or "ascertainable loss," and a plaintiff's claim cannot survive.  *See, e.g.*, *Lynn v. Fort McClellan Credit Union*, 2013 WL 5707372, at *7 (N.D. Ala. Oct. 21, 2013) (no monetary damages where plaintiff agreed to "total price" and received vehicle for that price); *Small v. Savannah Int'l Motors, Inc.*, 275 Ga. App. 12, 16 (2005) (no actual damages where plaintiff did not show she paid more for vehicle than its worth); *Kim v. Carter's Inc.*, 598 F.3d 362, 365–66 (7th Cir. 2010) (no actual damages under Illinois law where plaintiffs "agreed to pay a certain price for [the thing purchased], which they do not allege was defective or worth less than what they actually paid"); *Hennessy v. Gap, Inc.*, 86 F.4th 823, 828 (8th Cir. 2023) (no ascertainable loss under Missouri law where plaintiff paid advertised price and received expected products); *Abramowitz v.*

1    *Tropicana Atl. City Corp.*, 750 F. App'x 109, 113 (3d Cir. 2018) (no misrepresentation or

2    ascertainable loss under New Jersey law where defendants provided exactly what was offered); *In*

3    *re W. Va. Rezulin Litig.*, 214 W. Va. 52, 75 (2003) (a plaintiff can only show ascertainable loss

4    where the purchased item "is different from or inferior to that for which [plaintiff] bargained").

5    (*See also* App'x B at Rs. 1, 5, 6, 8, 9, 12.)

6         ***Second***, Kentucky courts are clear that the Consumer Protection Act in that state only

7    applies to the purchase or lease of "goods or services," both of which contemplate an ongoing

8    relationship between consumer and seller and exclude "providing the opportunity for gambling."

9    *Jacobs v. KRM Wagering LLC*, 2023 WL 3397511, at *5 (Ky. Ct. App. May 12, 2023) ("[W]e do

10   not believe gambling falls under the KCPA.").  (*See* App'x B at R. 7.)

11        **D.**    **Plaintiffs Cannot State a Claim Under Multiple States' Loss Recovery Statutes**
             **Because Google is not a "Winner" (Counts VI, IX, XII, XV, XXIV, XXVII,**
12           **XXIX, XXXI, XXXIII, XXXV, XXXVII, & XL).**

13        As discussed in Section IV(A)(2)(a)(ii) above, twelve of the loss recovery statutes giving

14   rise to Plaintiffs' claims ***only*** allow "losers" to recover gambling losses from a "***winner***."[15]  (*See*

15   App'x A at Rs. 3, 4, 6, 7, 11, 13–19, 20.)  Plaintiffs argue that Google is a "winner" because it

16   "profit[s] from each payment made by [Plaintiffs] to purchase virtual coins[.]"  (*See e.g.*, Compl. ¶

17   208.)  But "profit[ting]" from a purchase for in-app content does not transform Google into a

18   "winner."  "[U]nless otherwise defined, words [within statutes] will be interpreted as taking their

19   ordinary, contemporary, common meaning."  *Perrin v. United States*, 444 U.S. 37, 42 (1979).

20   None of the statues at issue ascribe special meaning to the word "winner" and, thus, "winner" takes

21   its ordinary meaning: "one that wins: such as (a) one that is successful . . . [or] (b) a victor especially

22   in    games    and    sports."     (*See*    Winner,    Merriam-Webster,    https://www.merriam-

23   webster.com/dictionary/winner.)  Here, far from being the "victor" in any of the games at issue,

24   ***Google does not even participate in the games***.  Instead, in processing payments for in-app content,

---

[15] New Jersey and New York also permit recovery from a "stakeholder" and Oregon and Washington from a "proprietor" but, as discussed in Section IV(A)(ii)(a)(2) above, Google is neither.  (*See also* App'x A at Rs. 11, 13, 15, 19.)

1    Google's only action from which it "profits" is concluded—with the revenue Google earns from

2    the transaction known and never put at stake—before any wager (and, therefore, any alleged

3    gambling) ever begins. (*See, e.g.*, Compl. ¶ 61 ("Google collects the money players spend on

4    virtual chips, takes a cut for itself, and remits the rest to the" Third-Party Apps).) "To suggest that

5    [Google] can be a winner without risking the possibility of being a loser defies logic and finds no

6    support in the law." *Humphrey*, 2007 WL 1797648, at *9-10 (considering Kentucky, New Jersey,

7    and South Carolina's loss recovery statutes, among others). (*See also* App'x A at Rs. 4 (*Langone*),

8    6 (*Gillespie*; *Tyler*), 11 (*Humphrey*).) One cannot be a winner if she "keeps the money a player

9    pays to buy additional chips no matter whether that player wins or loses in the games[.]" *Phillips*,

10   173 F. Supp. 3d at 740; *see also, e.g.*, *Manning v. v. Creative Headquarters, LLC,* 2012 U.S. Dist.

11   LEXIS 191219, at *5-6 (N.D. Ill. Mar. 30, 2012) (defendants are not "winners" under, as relevant

12   here, the Georgia, Illinois, Kentucky, New Jersey, Ohio, and South Carolina loss recovery statutes

13   where the fees "never hang in the balance because at no point do the . . . participants pay anything

14   to defendants that is any way dependent on the outcome of any" game). (*See also* App'x A at Rs.

15   4 (*Phillips*; *Reuter*; *Manning*), 7 (*Nagle*)]."). To consider Google a "winner" where it does not

16   participate in the games, risks no money, and its revenue does not depend upon the outcome of any

17   game is "a distortion of the plain meaning of the statute[s]," and Plaintiffs' claims fail. *Gillespie*

18   *v. Schomaker*, 191 F. Supp. 8, 10 (E.D. Ky. 1961).

19       **E.    Plaintiffs Fail to State a Claim Under RICO (Counts XLIII and XLIV).**

20       Even if Section 230 did not bar Plaintiffs' RICO claim (it does), Plaintiffs fail to state a

21   claim under RICO. Under either 18 U.S.C. Sections 1962(c) or (d), Plaintiffs must allege that

22   Google acted in (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity

23   that (5) caused injury to Plaintiffs' business or property. *See* 18 U.S.C. §§ 1962(c), 1964(c); *see*

24   *also, e.g.*, *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010) ("Plaintiffs cannot

25   claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive

26   violation of RICO [under Section 1962(c)]."). Failure to establish any of these elements is fatal to

27   Plaintiffs' claims. *See, e.g., Rae v. Union Bank*, 725 F.2d 478, 480–81 (9th Cir. 1984). To "flush

28   out frivolous RICO allegations at an early stage" courts look with particular scrutiny at claims for

a civil RICO violation. *Wagh v. Metris Direct Servs., Inc*., 348 F.3d 1102, 1108 (9th Cir. 2003) (citations omitted), overruled on other grounds, *Odom v. Microsoft Corp*., 486 F.3d 541, 551 (9th Cir. 2007). Here, Plaintiffs have not: (1) suffered injury to business or property, so lack standing or (2) alleged the existence of an "enterprise" or that Google participated in the conduct of the alleged enterprise's affairs. What is more, when RICO allegations are premised on fraud, as they are here (*see* Compl. ¶ 574 ("Pursuant to and in furtherance of this fraudulent scheme. . ."), they are subject to Rule 9(b)'s heightened pleading standard. *See Alan Neuman Prods, Inc. v. Albright*, 862 F.2d 1388, 1392-93 (9th Cir. 1988) ("th[e] circumstances constituting fraud [must] be stated with particularity," including "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations") (internal citations omitted). But Plaintiffs do not even attempt to provide a single factual allegation explaining how the only conduct of Google that remains at issue—"processing and profiting from" in-app transactions and "providing development assistance to . . . developers" (Comp. ¶ 559)—was in service of any allegedly "fraudulent scheme" including, crucially, any of the details regarding Google's purported involvement in that scheme.

### 1.    Plaintiffs lack standing to bring RICO claims.

To have standing to bring a civil RICO claim, a plaintiff must "ha[ve] been injured in his business or property by the conduct constituting the [RICO] violation." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *see also* 18 U.S.C. § 1964(c). It is well-settled that "private plaintiffs alleging injuries resulting from ***their own gambling*** cannot establish 'injury to business or property' under RICO." *Green v. Aztar Corp*., 2003 WL 22012205, at *2 (N.D. Ill. Aug. 22, 2003) (citing *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1087 (9th Cir. 2002) (emphasis added); *see also, e.g.*, *Dumas v. Major League Baseball Props., Inc.*, 104 F. Supp. 2d 1220, 1222-23 (S.D. Cal. 2000) ("the act of gambling *per se* is not sufficient to show an injury to one's business or property under RICO"). Thus, RICO is inappropriate because a plaintiff's purported gambling losses "represent a property *interest* rather than an *injury* to property or business[.]" *Romano v. Torch Elecs., LLC*, 2023 WL 9064602, at *3 (W.D. Mo. Aug. 21, 2023) (dismissing RICO claim for lack of standing where plaintiffs lost money playing defendants' "illegal" slot machines)

1    (emphasis in original).  That the underlying gambling activity is alleged to be illegal is irrelevant

2    and does not transform the gambling loss into a cognizable RICO injury.  *See Schwartz v. Upper*

3    *Deck Co*., 104 F. Supp. 2d 1228, 1230 (S.D. Cal. 2000) (rejecting the argument that an "allegation

4    of unlawful gambling, without more, is sufficient to demonstrate" an injury to business or property

5    under RICO); *see also Price v. Pinnacle Brands, Inc*., 138 F.3d 602, 607 (5th Cir. 1998) (even

6    entitlement to state law remedies for gambling losses does not satisfy RICO's injury requirement).

7         Plaintiffs attempt to plead around this fatal flaw by alleging, "on information and belief,"

8    that "the Social Casino enterprise[] . . . rigged and manipulated slot machines."  (Compl. ¶ 550.)

9    *See Adell v. Macon Cnty. Greyhound Park, Inc*., 785 F. Supp. 2d 1226, 1241 (M.D. Ala. 2011)

10   (gambling losses may confer RICO standing only if occasioned by plausibly pled allegations of

11   fraud).  But Plaintiffs fail to plead a single fact demonstrating that ***Google*** "rigged and manipulated"

12   the Third-Party Apps, so have not alleged that ***Google's conduct caused*** their alleged injury, as is

13   required to demonstrate RICO standing.  *See, e.g.*, *Chaset*, 300 F.3d at 1087 (defendant's conduct

14   must be a proximate cause of plaintiff's injury to support RICO standing).  Additionally, allegations

15   made on "information and belief"—without explanation of the basis for the belief or facts

16   supporting it—are insufficient to support a RICO claim.  *See, e.g.*, *BMA LLC v. HDR Glob. Trading*

17   *Ltd*., 2021 WL 949371, at *10-11 (N.D. Cal. Mar. 12, 2021).  Absent cognizable injury, Plaintiffs

18   lack standing and their RICO claims fail.

19         **2.    Plaintiffs have not alleged a RICO enterprise or Google's conduct in it.**

20         Even if Plaintiffs had standing to bring civil RICO claims (they do not), they have not

21   alleged the existence of a RICO enterprise or that Google participated in the conduct of that

22   enterprise's affairs.  As to the existence of the enterprise itself, to plead an "association-in-fact"

23   enterprise (as Plaintiffs allege exists here (*see* Compl. ¶ 562)), "plaintiffs must plead that the

24   enterprise has (A) a common purpose, (B) a structure or organization, and (C) longevity necessary

25   to accomplish the purpose."  *Eclectic Props. E., LLC v. Marcus & Millichap Co*., 751 F.3d 990,

26   997 (9th Cir. 2014) (citing *Boyle v. U.S.*, 556 U.S. 938, 946 (2009)).  Crucially, "characterizing

27   routine commercial dealing as a RICO enterprise is not enough."  *Gardner v. Starkist Co*., 418 F.

28   Supp. 3d 443, 461 (N.D. Cal. 2019).  Indeed, "courts have overwhelmingly rejected attempts to

1    characterize routine commercial relationships as RICO enterprises." *Shaw v. Nissan N. Am., Inc.*,

2    220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016).  Thus, where there is no entity created to serve a

3    common purpose that exists *separate* from the purpose of the individual entities claimed to

4    constitute the enterprise who are merely "conducting the regular business of their corporate entities

5    or businesses in their own interests," there is no RICO enterprise.  *In re JUUL Labs, Inc., Mktg.*

6    *Sales Pracs. & Prod. Liabl. Litig.*, 497 F. Supp. 3d 552, 599 (N.D. Cal. 2020) (cleaned up); *see*

7    *also, e.g.*, *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 2012 WL 10731957, at *8

8    (C.D. Cal. June 29, 2012) ("[e]ven if . . . the non-parties' actions assisted [Google]," where that

9    "assistance was in response to each entity's *own business incentives*[,]" there is no RICO

10    enterprise) (emphasis added); *U.S. v. Turkette*, 452 U.S. 576, 583 (1981).  Indeed, "[a]n abstract

11    common purpose, such as a generally shared interest in making money, will not suffice." *Cisneros*

12    *v. Petland, Inc.*, 972 F.3d 1204, 1211-12 (11th Cir. 2020).

13        Here, Plaintiffs allege that Google (1) hosted the Third-Party Apps; (2) provided consumers

14    with access to those Apps; (3) processed in-app transactions; and (4) collected its share of the

15    revenue generated by in-app transactions.  (Compl. ¶ 566.)  In other words, Plaintiffs have alleged

16    only that Google engaged in its ordinary business conduct—the precise commercial behavior for

17    which the Google Play Store was designed, and that Google (or any platform) would engage to

18    provide *any* app to consumers.  (Compl. ¶ 73 ("Google entered into a mutually beneficial business

19    partnership" with the Third-Party Apps where "[i]n exchange for pushing and distributing the

20    [Apps] and collecting money from consumers, Google and other Platforms take a . . . commission

21    off of every in app purchase") (emphasis added).)  Plaintiffs' attempt to characterize this routine

22    and general conduct as a RICO enterprise with the common purpose of "target[ing] and retain[ing]

23    high-spending users in [an] online gambling scheme throughout the country" (Compl. ¶ 565) fails.

24    *See, e.g., In re Jamster Mktg. Litig.*, 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009) (no RICO

25    enterprise where the alleged conduct—advertising, billing and collecting payments, and retaining

26    a portion of the payments—was "consistent with ordinary business conduct and an ordinary

27    business purpose"); *In re JUUL Labs*, 497 F. Supp. 3d at 603 (no RICO enterprise where defendants

28    went into business for their mutual benefit); *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042, at

1    *8 (C.D. Cal. July 13, 2015) ("routine commercial relationships[,]" including payment processing,

2    will not support a RICO claim) (collecting cases).

3        As to participating in the conduct of the alleged enterprise, "in order to participate, directly

4    or indirectly, in the conduct of such enterprise's affairs, one must have some part in directing those

5    affairs*." *Reves v. Ernst & Young,* 507 U.S. 170, 179 (1993).  Plaintiffs allege, in conclusory

6    fashion, that Google "agreed to conduct and carry out the affairs and goals of the Social Casino

7    Enterprise" (Compl. ¶ 566) but, in support, point only to Google's regular business practice of

8    generically hosting apps and processing in-app transactions (*id.* ¶ 522B).  Plaintiffs have not made

9    a single allegation that ***Google*** participated in any way in directing the enterprise's purported

10   fraudulent scheme, nor could they, and their RICO claims fail.

### 3.    Plaintiffs' claim under Section 1962(d) additionally fails because Plaintiffs did not allege a conspiracy.

12       Setting aside that Plaintiffs did not adequately allege the requisite elements to state a RICO

13   claim under Section 1962(c) and, therefore, also failed under Section 1962(d), they have

14   additionally failed to allege a conspiracy.  "[S]imply alleging that [Defendants] agreed to do

15   business with the alleged enterprise does not establish a RICO conspiracy[.]" *Alves v. Players Edge,

16   Inc*., 2007 WL 6004919, at *12 (S.D. Cal. Aug. 8, 2007).  Despite Plaintiffs' conclusory claims

17   that Google "acted knowingly" and "agreed to . . . participate in the . . . racketeering activity"

18   (Compl. ¶ 579), they present no ***facts*** that Google "***intend[ed]*** to further . . . a substantive criminal

19   offense," *Salinas v. United States*, 522 U.S. 52, 65 (1997) (emphasis added)—only facts showing

20   that Google engaged in routine commercial behavior, by hosting third-party apps and processing

21   in-app transactions.  (Compl. ¶¶ 61, 71, 73.)  "One cannot be liable for conspiracy pursuant to 18

22   U.S.C. § 1962(d) for simply providing a service to a RICO enterprise, and 'mere association' with

23   an enterprise does not 'constitute an actionable § 1962(d) violation.'"  *Alves*, 2007 WL 6004919,

24   at *13 (quoting *Baumer v. Pachl*, 8 F.3d 1341, 1345-47 (9th Cir. 1993)).  Thus, Plaintiffs' claim

25   under Section 1962(d) should be dismissed.

26

27

28

1  **V.    CONCLUSION**

2       Google respectfully requests the Court enter an order dismissing Plaintiffs' Complaint in its

3  entirety under Section 230 or, alternatively, dismissing certain claims as outlined above.

4  Dated: November 22, 2024                COOLEY LLP

5

6                                         By:  /s/ Teresa Michaud

7                                              Teresa Michaud

8                                         Attorneys for Defendant
                                          GOOGLE LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28