COOLEY LLP
TERESA MICHAUD (296329)
(tmichaud@cooley.com)
SARA VICTORIA M. PITT (317611)
(sporter@cooley.com)
355 South Grand Avenue, Suite 900
Los Angeles, California  90071
Telephone:     +1 213 561 3250
Facsimile:     +1 213 561 3244

WHITTY SOMVICHIAN (194463)
(wsomvichian@cooley.com)
AUDREY J. MOTT-SMITH (300550)
(amottsmith@cooley.com)
THILINI CHANDRASEKERA (333672)
(tchandrasekera@cooley.com)
KELTON N. MURPHY (340366)
(kbasirico@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California  94111-4004
Telephone:     +1 415 693 2000
Facsimile:     +1 415 693 2222

Attorneys for Defendant
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| IN RE: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-md-03001-EJD<br><br>**DEFENDANT GOOGLE LLC'S REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>Date:       March 7, 2025<br>Time:       9:00 a.m.<br>Dept:       4<br>Judge:      Hon. Edward J. Davila |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.   ARGUMENT .................................................................................................................. 2

    A.    Section 230 Requires Dismissal of Plaintiffs' Claims ........................................... 2

        1.    Treating Google's payment processing as "gambling transactions" requires treating Google as a publisher of the Apps' content, and Plaintiffs' loss recovery claims are barred.. ................................................ 4

        2.    Plaintiffs' RICO, consumer protection, and unjust enrichment claims are barred for the same reasons ...................................................... 11

    B.    Plaintiffs Lack Statutory Standing to Bring Their Consumer Protection Claims ............................................................................................................... 12

    C.    Plaintiffs Cannot State a Claim Under the Loss Recovery Statutes..................... 13

III.  CONCLUSION ............................................................................................................. 15

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Ashcroft v. Iqbal*,
5
    556 U.S. 662 (2009) ............................................................................................... 9

6

*Berns v. Shaw*,
    65 W. Va. 667 (1909) ............................................................................................. 15

7

*Calise v. Meta Platforms, Inc.*,
8
    103 F.4th 732 (9th Cir. 2024) ........................................................................ *passim*

9

*Cody v. Ring LLC*,
    718 F. Supp. 3d 993 (N.D. Cal. 2024) .................................................................. 12

10

*Coffee v. Google LLC*,

11
    2022 WL 94986 (N.D. Cal. Jan. 10, 2022) ................................................. 3, 6, 8, 9

12

*Collins v. Kentucky Lottery Corp.*,
13
    399 S.W.3d 449 (Ky. Ct. App. 2012) ................................................................... 13

14

*Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*,
    617 S.W.3d 792 (Ky. 2020) ................................................................................... 14

15

*Doe v. Grindr Inc.*,

16
    -- F.4th --, 2025 WL 517817 (9th Cir. Feb. 18, 2025) ......................................... 11

17

*Doe v. Internet Brands, Inc.*,
18
    824 F.3d 846 (9th Cir. 2016) .................................................................................. 8

19

*Doe v. WebGroup Czech Republic, A.S., et al.*,
    No. 2:21-CV-02428 (C.D. Cal. Feb. 21, 2025), Dkt. No. 205 ............................... 8

20

*Dryoff v. Ultimate Software Grp.*,

21
    934 F.3d 1093 (9th Cir. 2019) .............................................................................. 11

22

*Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*,
23
    112 F.4th 1168 (9th Cir. 2024) ........................................................................ 3, 10

24

*Hardin v. NBC Universal, Inc.*,
    660 S.E.2d 374 (Ga. 2008) ..................................................................................... 5

25

*Hartford Acc. & Indem. Co. v. Benevento*,

26
    133 N.J.L. 315 (1945) ........................................................................................... 14

27

*Hensler v. Jennings*,
28
    62 N.J.L. 209 (1898) ............................................................................................. 14

COOLEY LLP
ATTORNEYS AT LAW

1

**TABLE OF AUTHORITIES**
(Continued)

2

**Page**

3

*HomeAway.com, Inc. v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019).................................................................. 2, 7, 8

4

5

*Humphrey v. Viacom, Inc.*,
   2007 WL 1797648 (D.N.J. June 19, 2007) ............................................... 15

6

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
   625 F. Supp. 3d 971 (N.D. Cal. 2022) .................................................... 2, 3

7

8

*In re Facebook Simulated Casino-Style Games Litig.*,
   2024 WL 2287200 (9th Cir. May 21, 2024) ................................................. 2

9

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
   2024 WL 4532937 (N.D. Cal. Oct. 15, 2024) ............................................ 13

10

11

*Jacobs v. KRM Wagering, LLC*,
   2023 WL 3397511 (Ky. Ct. App. May 12, 2023) ...................................... 13

12

13

*Linder v. Golden Gate Bridge, Highway & Transp. Dist.*,
   2015 WL 4623710 (N.D. Cal. Aug. 3, 2015) ............................................ 12

14

15

*Phillips v. Double Down Interactive LLC*,
   173 F. Supp. 3d 731 (N.D. Ill. 2016) ......................................................... 5

16

*Reuter v. MasterCard Int'l, Inc.*,
   397 Ill. App. 3d 915 (2010) .................................................................... 5, 6

17

18

*Snapkeys, Ltd. v. Google LLC*,
   539 F. Supp. 3d 1040 (N.D. Cal. 2021) ................................................... 12

19

20

*Sullivan v. Stroop*,
   496 U.S. 478 (1990)................................................................................. 15

21

*Triplett v. Seelbach*,
   14 S.W. 948 (Ky. Ct. App. 1890) ............................................................ 14

22

23

*Tyler v. Goodman*,
   240 S.W.2d 582 (Ky. Ct. App. 1951) ...................................................... 14

24

25

26

27

28

1

**TABLE OF AUTHORITIES**
(Continued)

2

**Page**

3

**Statutes**

4

18 U.S.C.

5

§ 1084.................................................................................................... 11
§ 1955.................................................................................................... 12

6

N.J. Stat.

7

§ 2A:40-5 .............................................................................................. 15
§ 2A:40-6 .............................................................................................. 15

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

## I.    INTRODUCTION

The facts pled in the Master Complaint (the "Complaint") demonstrate that the tools and services Google provides to third-party app developers are the same no matter what content developers create and offer for sale within their apps—music, videos, digital avatars, or here, virtual chips that can be used to play simulated casino-style games.  Plaintiffs' argument that Google acts as the "house, cage, and bookmaker" ignores that reality, and is premised not on what Google does but on the specific content of the apps Plaintiffs challenge (the "Third-Party Apps" or "Apps").  But no matter how many times Plaintiffs try to recast Google's role by using evocative language, their conclusory labels do not change the facts as pled.  All Plaintiffs allege is that Google processes payment for in-app purchases, but that does not mean that it "participates" in what is being purchased or plays any role in Plaintiffs' subsequent use of that content.  Plaintiffs do not plead that Google's payment processing is any different from the "processing" it provides for any other in-app purchases, nor could it, as Google does not take any bet or wager, track or report on the odds of winning, or do anything else that even remotely resembles acting as a "house, cage, [or] bookmaker."  Looking at the facts, rather than Plaintiffs' labels, all Plaintiffs' claims must fail.

Section 230 of the Communications Decency Act ("Section 230") bars Plaintiffs' entire Complaint.  Following the Ninth Circuit's guidance, the Court must assess each cause of action separately, looking at the underlying legal duty each creates to determine whether finding that Google violated that duty would also require treating Google as the publisher or speaker of the Apps' content.  Plaintiffs argue that a single duty, not to "broker unlawful gambling transactions," is what creates liability under all their claims.  But nothing about Google's own conduct violates the duty not to engage in gambling transactions, so Plaintiffs' claims depend on holding Google responsible for the Apps' content, which is precisely what Section 230 precludes.  Plaintiffs' RICO claims and state loss recovery, consumer protection, and unjust enrichment claims additionally cannot survive on their merits, as Plaintiffs have failed to allege necessary elements of each.

Google incorporates by reference and joins in Defendants Meta Platforms, Inc.'s ("Meta") and Apple Inc.'s ("Apple") arguments in their concurrently filed reply briefs ("Meta Reply" and "Apple Reply," respectively) regarding the deficiencies in Plaintiffs' RICO and state law claims.

**II.    ARGUMENT**

    **A.    Section 230 Requires Dismissal of Plaintiffs' Claims.**

Plaintiffs argue that the Court's prior order on Section 230 "should have largely settled the Section 230 issue as far as the pleadings are concerned[.]" (Pls.' Consolidated Opp. to Motions to Dismiss, Dkt. No. 130 ("Opp.") at 7.) But Plaintiffs ignore the Ninth Circuit's opinion approving the Court's decision to decide this "threshold issue[]" first but remanding because Section 230 requires a "claim-specific analysis." *See In re Facebook Simulated Casino-Style Games Litig.* ("*In re Facebook*"), 2024 WL 2287200, at *2 (9th Cir. May 21, 2024). To conduct such an analysis, since only the second prong of the *Barnes* test is at issue, for each claim the Court "must identify 'the underlying legal duty' and determine whether 'it seek[s] to hold the defendant liable as a 'publisher or speaker' of third-party content.'" *Id.* (quoting *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019)). Accordingly, in the Court's order following remand, the Court invited Defendants to use a portion of their briefs to address Section 230, instructing that the "remaining Section 230 issue is whether Plaintiffs' claims can be brought under the sole surviving theory of liability, which has sometimes been referred to as the 'bookie theory'" (Dkt. No. 116 at 2)—and which the Court has alternatively styled as a "revenue-based" theory. *See In re Apple Inc. App Store Simulated Casino-Style Games Litig.* ("*In re Apple*"), 625 F. Supp. 3d 971, 994 (N.D. Cal. 2022).[1] The answer to that question is "no." Thus, it remains true that resolving Section 230's application now would "materially advance the ultimate termination of the litigation and would ensure that resources are not wasted on needless litigation and expenses." *Id.* at 996.

For Plaintiffs' revenue-sharing theory to survive, Plaintiffs' causes of action would each have to create a sweeping standalone legal duty not to process payments for in-app content for a fee. (*See* Google Motion to Dismiss, Dkt. No. 125 ("Mot.") at 10; Apple Mot.[2] at 11–14.)

---

[1] Plaintiffs argue that Google seeks reconsideration (*see* Opp. at 8), but that is plainly not the case given the Ninth Circuit's and this Court's orders.

[2] "Apple Mot." refers to Apple's motion to dismiss filed at Dkt. No. 145, *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, No. 5:21-md-02985-EJD (N.D. Cal. Nov. 22, 2024).

Otherwise, looking at the facts as pled and stripped of Plaintiffs' legal conclusions, nothing about Google's "***own role***" (*see* Opp. at 7 (emphasis added)) could create liability; Google could only be liable under the statutes if held responsible for the Apps' content (virtual chips that can be used to play simulated casino-style games).  But the loss recovery and consumer protection statutes at issue create no such overbroad and business-stifling duty not to transact in third-party content.[3]  The Ninth Circuit and courts within it have rejected similar attempts to improperly hold platforms liable when they share in revenue derived from allegedly unlawful third-party content on their sites.  *See, e.g.*, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 736–37, 742–44 (9th Cir. 2024) (Section 230 precluded plaintiffs' claim against the defendant platform where the defendant generated revenue from allegedly unlawful third-party advertisements); *Coffee v. Google LLC*, 2022 WL 94986, at *6 (N.D. Cal. Jan. 10, 2022) (Google was immune under Section 230 where it received a portion of the revenue from the sale of allegedly illegal in-app content).  And for good reason: Section 230 is intended to "eliminate any chilling effect that tort liability would have on interactive service providers" for whom "[i]t would be impossible . . . to screen each of the[] millions of postings [on their sites] for possible problems." *In re Apple*, 625 F. Supp. 3d at 980.  But, absent a decision that ignores this precedent by finding that the duty at issue here is not to transact in third-party published content, full stop, the ***only way*** to find Google liable is to "hold [Google] responsible for [the Apps'] speech or [Google's] decision to publish it." *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.* ("*Yolo*"), 112 F.4th 1168, 1180 (9th Cir. 2024).  Section 230 precludes this result.  (*See* Mot. at 7.)

Plaintiffs try to avoid Section 230 by disregarding Google's extensive analysis regarding the legal duties undergirding their claims, instead asserting (without reference to a ***single*** statute) that the only duty at issue is "not to broker unlawful gambling transactions."  (Opp. at 7.)  This is not what any of the 24 statutes provide and, regardless, Plaintiffs do not plausibly plead that ***Google*** violated any such duty because Google is not involved in anything that could fairly be called a "gambling transaction"—only the users and Apps are.  Plaintiffs' claims should, therefore, be

---

[3] Plaintiffs' unjust enrichment claims are predicated on the same allegedly illegal "gambling" activity as their loss recovery claims and rise and fall with those claims.

1    dismissed under Section 230 because they seek to hold Google liable as the publisher or speaker of

2    the content of the Third-Party Apps.

3        **1.    Treating Google's payment processing as "gambling transactions"
            requires treating Google as a publisher of the Apps' content, and**

4        **Plaintiffs' loss recovery claims are barred.**

5        The state loss recovery statutes at issue confer upon Plaintiffs the right to (1) void gambling

6    contracts and/or (2) recover gambling losses from having placed a bet or wager.  (*See* Mot. at 11–

7    17; App'x A at Rs. 1–20.)  Thus, they create an underlying duty to (1) not enter a gambling contract

8    and/or (2) return gambling losses.  *See Calise*, 103 F.4th at 743 ("duty [is] a two-way street of

9    obligations and rights" so, where a plaintiff has a right to receive a certain benefit, the defendant's

10   underlying duty is the "return of [that] benefit") (citations omitted).  (*See also* Mot. at 11–14.)

11       Despite Plaintiffs' attempt to obfuscate the issue by repeatedly labeling Google a "bookie"

12   and "cage cashier" (Opp. at 7, 10, 11), Plaintiffs' allegations as to ***Google's*** conduct simply do not

13   implicate either underlying duty.  Plaintiffs do not allege that Google entered a gambling contract

14   with any individual at any time.  Instead, they argue that "Google . . . broker[ed] gambling

15   transactions" and thus "aids in the exercise of illegal gambling."  (Opp. at 9 (cleaned up).)  But

16   Plaintiffs fail to explain what they mean by "brokering" and how Google's act of processing

17   payments for in-app transactions is "brokering" here, when Google provides the exact same

18   content-neutral service for millions of other apps on Google Play.  Indeed, as pled, Google's actions

19   are as follows: "Google collects the money players spend on [in-app items], takes a cut for itself,

20   and remits the rest to the [Apps]."  (Compl. ¶ 61.)  Players can then use the purchased items in the

21   Apps "to (1) place wagers on slot machine spins; (2) place wagers on the few card game or bingo

22   titles in the [Apps], or (3) give a 'gift' of [purchased items] to another account in the app."  (*Id.* ¶

23   63.)  Thus, there are two transactions: (1) a transaction to purchase in-app content, which Google

24   facilitates; and (2) a subsequent transaction in which App users take certain actions with the virtual

25   chips, which involves only those users and the Apps and with which Google has no part.  Even if

26   Plaintiffs' ***second*** transaction could constitute gambling that implicates the loss-recovery statutes

27   (and it does not), their first transaction—the ***only*** transaction involving Google—cannot.

28       A gambling transaction is one that is "supported by a 'gambling consideration,'" meaning

1   it involves a **bet** or a **wager**.  *See Hardin v. NBC Universal, Inc.*, 660 S.E.2d 374, 375 (Ga. 2008)

2   (citation omitted); *see also, e.g.*, *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731,

3   740 (N.D. Ill. 2016) (defendant did not engage in "gambling" under the Illinois loss recovery statute

4   because "no amount of earned money ever hangs in the balance or depends on the outcome of a

5   game").  (*See generally* Mot. at 11–12; App'x A at R. 4 (Ill.).)  Plaintiffs' own allegations establish

6   that the fee Google collects is based only on the **purchase** of the "virtual chips" the Apps sell:

7   "Google collects the money players spend on virtual chips, takes a cut for itself, and remits the rest"

8   to the Third-Party App developers.  (Compl. ¶ 61; *see also id.* ¶ 60 (players "navigate" away from

9   gameplay to an "electronic store" in the Apps to purchase virtual chips); ¶ 3 (the Apps offer the

10  "virtual chips").)  Because Plaintiffs have not put any of the purchased in-app content at stake in

11  their transaction with Google (*i.e.,* they pay for and receive the precise virtual content requested),

12  they have not placed any bet or wager at the time Google processes the payment, and Google's

13  revenue does not derive from a gambling transaction.  *See Reuter v. MasterCard Int'l, Inc.*, 397 Ill.

14  App. 3d 915, 923 (2010) (credit card companies did not engage in gambling when players used

15  credit cards to purchase gambling chips because the fees the credit cards charged "***occur[ed] before***

16  ***any gambling takes place and [were] not affected by the outcome of the gambling***") (emphasis

17  added).[4]  (*See also* Mot. at 11–13.)

18      Indeed, ***every statute at issue*** is clear that, to recover, a plaintiff must have deposited a

19  **wager** or **lost**.  (*See* App'x A at pp. 1–10: R. 1 (Ala.) "**lost** upon any game or **wager** "; R. 3 (Ga.)

20  "by the **loser**"; R. 4 (Ill.) "who by gambling shall **lose**"; R. 6 (Ky.) "**loses** to another"; R. 7 (Minn.)

21  "**lose** . . . so playing or **betting**"; R. 8 (Miss.) "by any **wager** . . . shall **lose**"; R. 9 (Mo.) "**lose** . . .

22  by any bet or **wager**"; R. 10 (Mont.) "by playing or **betting** . . . **loses**"; R. 11 (N.J.) "person shall

23  **lose**"; R. 13 (N.Y.) "**pay, deliver, or deposit** . . . upon the event of any **wager**"; R. 14 (Ohio) "by

24  ───────────────

25  [4] Plaintiffs' attempt to distinguish *Reuter* fails.  (*See* Opp. at 32–33.)  Unlike the financing company

26  there*,* Google is not in the business of internet gambling.  Rather, like the defendant credit card

27  company, it just collects a fee for processing a payment, which here is for virtual currency, but

28  could be anything, used for any purpose in the Apps.  *See Reuter*, 397 Ill. App. 3d at 918.

1  playing a game, or by a **wager**, **loses**”; R. 15 (Or.) “**losing** money . . . on any unlawful game”; R.

2  16 (S.C.) “**lose** . . . so playing or **betting**”; R. 18 (Va.) “by playing . . . or **betting** . . . **lose**”; R. 19

3  (Wash.) “**losing** money . . . on any illegal gambling”; R. 20 (W. Va.) “person shall **lose**.”)

4       Plaintiffs have nothing to say about this statutory language as it pertains to Google’s Section

5  230 arguments, instead quipping that Google should just “look at the money in its pockets and

6  figure out where it came from.” (Opp. at 9.) But requiring Google to monitor content to know

7  **which** proceeds to segregate is exactly the problem, since to do so Google would have to track and

8  analyze every **second** transaction that occurs after the **first** transaction with Google. And again,

9  nothing about the first transaction with Google could plausibly be considered a “wager” or a “loss.”

10  Those payments are routine purchases of the kind consumers make every single day in all kinds of

11  apps. Plaintiffs did not stake money but spent money to buy third-party in-app content (the virtual

12  currency),[5] to use or gift as they liked (or not at all). Spending money on virtual currency is not a

13  “gambling transaction.” *See Reuter*, 397 Ill. App. at 920; *see also Coffee*, 2022 WL 94986, at *6

14  (plaintiffs’ purchase of virtual currency, which they could subsequently use in apps that contained

15  alleged gambling functions, was not gambling). (*See also* Mot. at 11–13, 24.)

16       Plaintiffs also fail to respond to Google’s argument as it pertains to Section 230 that certain

17  of the loss recovery statutes additionally only allow recovery from “winners,” which Google is not.

18  (*See* Mot. at 14–16.) To the extent Plaintiffs address the statutory “winner” language elsewhere in

19  their brief (Plaintiffs generally reference “Sections II–V” (*see* Opp. at 7)), Plaintiffs’ cases are

20  inapposite. Unlike the defendants in every case they cite, Plaintiffs have not plausibly alleged that

21  Google owns or operates the Apps here or has a stake in the outcome of any bid or wager placed

22  by a Plaintiff in a game on the Apps. (*See* App’x A at Rs. 1, 3–4, 6–11, 13–16, 18–20; Opp. at 27–

23  34; *see also* Section II(B), *infra*; Apple Reply § II(A).)

24       Recognizing this fatal flaw, Plaintiffs argue that the two transactions at issue here are one,

25  asserting without factual support that Google “broker[ed]” the latter. (Opp. at 9.) They claim that

26

27  [5] Despite calling Google a “cage cashier” (Opp. at 11), Google would have to monitor third-party

28  content to know the Apps were selling “virtual chips for gambling” (*id.*).

Google should be responsible for *how* Plaintiffs decide to interact with the Third-Party Apps—*after* Plaintiffs' transaction with Google is complete—because the virtual chips "are substantially certain to be used to wager on a slot machine spin." (*Id.* (cleaned up).) There are two problems with this argument. First, it requires Google to monitor the Third-Party Apps' content to evaluate if users' subsequent transactions within the games could constitute alleged illegal gambling. That would require the very monitoring that Section 230 forbids as a basis for liability. Second, this argument contradicts Plaintiffs' own pleadings, which make clear that those who purchase virtual chips may use them in at least three different ways—two of which, by Plaintiffs' admission, could never support liability under the loss recovery statutes. (*See* Mot. at 12; *see also* Compl. ¶ 61.) Even if "[s]ubstantially all virtual chips are used on slot machine spins" (Compl. ¶ 63; *see also* Opp. at 9), "substantially all" is *not all,* and predications about what users may do cannot dissolve the difference between facilitating the purchase of virtual content and a separate choice by users about how they wish to use that content. On Plaintiffs' theory, wagering occurs only when the chips are used, and Google has nothing to do with that.

In short, the only way to hold Google liable for Plaintiffs' future use of the in-app content they purchased (which, from Google's perspective, could be anything—for example, premium content like special avatars or virtual clothes, access to hidden areas or bonus levels in a game, or services like ad removal), would be to treat Google as a publisher or speaker of the Third-Party Apps, in violation of Section 230.

The Ninth Circuit's decision in *HomeAway* provides a helpful counterfactual. There, the court held that the platforms could comply with their duty not to process transactions for unregistered properties *without* reviewing the content of any listings on their platforms—because, crucially, the City of Santa Monica provided an external registry of unregistered properties that the platforms could cross-reference. *See HomeAway.com*, 918 F.3d at 682–83. In other words, the platforms were not required to adjudicate unlawfulness by looking to any third-party content and only had to refrain from doing business with properties on a government-provided list. Accordingly, because the platforms violated the duty at issue (processing transactions proscribed by the city ordinance) by their own acts, and compliance would not "require [them] to monitor

1    third-party content," Section 230 immunity did not apply.  *Id.* at 682 (citation omitted); *see also*

2    *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850-53 (9th Cir. 2016)).  Here, in contrast, Google's

3    payment processing services do not, by themselves, violate the duty at issue (as Plaintiffs have not

4    placed a bet or wager with Google or lost money gambled to Google) and, to prevent a violation

5    on Plaintiffs' own theory, Google would have to review, monitor, and adjudicate the content of the

6    millions of third-party apps and how each player uses what they purchased in those apps–all on a

7    state-by-state basis.[6]  Thus, Plaintiffs' reliance on *HomeAway* is misplaced.  (*See* Opp. at 8, 10.)

8        Judge Garnett in the Central District of California just rejected a similar theory holding that

9    Section 230 immunized platform defendants where they shared revenue derived from allegedly

10   illegal content.  *See* Ex. 1 to the Declaration of Audrey Mott-Smith (Order Granting Motion to

11   Dismiss, *Doe v. WebGroup Czech Republic, A.S., et al.*, No. 2:21-CV-02428, (C.D. Cal. Feb. 21,

12   2025), Dkt. No. 205).  There, plaintiff alleged "she was trafficked as a minor" and the defendants

13   unlawfully shared revenue from the CSAM videos of her that the traffickers uploaded to the

14   defendants' websites.  *Id.* at 2.  However, the court distinguished those circumstances from others

15   where "an online service provider's revenue-sharing conduct, alone, violates a statute irrespective

16   of the user's online content," and found that, "Defendants' revenue-sharing activities that Plaintiff

17   challenges cannot be divorced from the users' own conduct of filming and independently

18   disseminating the infringing content."  *Id.* at 11.  As a result, the court dismissed plaintiff's claims

19   with prejudice, holding that they were "indeed directed at third-party's conduct and do not

20   independently challenge Defendants' revenue-sharing activities."  *Id.*

21       Judge Freeman recognized this same distinction in *Coffee*, 2022 WL 94986.  There,

22   plaintiffs sought to hold Google liable for the same conduct at issue here: processing a payment for

23   virtual currency that could then be used in third-party games for purposes plaintiffs alleged were

24   illegal.  *Id.* at *2.  But the court distinguished Google's role in the transaction for virtual currency

25   from users' subsequent use of that currency, explaining: "Google's conduct in processing sales of

26

27   [6] There are 50 Apps at issue in this case under the laws of 16 states and, unlike in *HomeAway*, no

28   government registry or court determination as to the lawfulness of each App in each state.

virtual currency is not alleged to be illegal. . . . If indeed the sale of Loot Boxes is illegal, the facts alleged in the FAC indicate that such illegality is committed by the developer who sells the Loot Box for virtual currency, not by Google." *Id.* at *6. Just as here, in *Coffee* there were two transactions at issue—a transaction for virtual currency that Google facilitated, and a second transaction between only the user and the app that allegedly involved illegal gambling. No matter how many times Plaintiffs call Google a "bookie" or a "broker" or claim that Google is "directly participating" in "illegal gambling" (*see, e.g.*, Opp. at 5, 8, 9, 18, 23, 27, 30, 33, 37 42), their labels do not change the pled facts and, nothing about Google's content-neutral conduct could plausibly violate the duties the loss recovery statutes impose.[7]

Plaintiffs also take issue with Google's argument that, to satisfy the duty not to enter gambling contracts or retain gambling losses, Google would be required "to monitor third-party content—or else face liability." *Calise*, 103 F.4th at 742 (cleaned up). (*See* Opp. at 11–14; *see also* Mot. at 13–14.) Plaintiffs' response amounts to arguing that Google had other options than content moderation and, therefore, Section 230 does not apply. (*See* Opp. at 12–14.) But what Plaintiffs present as alternatives either (1) still require content moderation or (2) amount to abandoning all payment processing for ***all*** apps on Google's platform, effectively requiring Google to end its business transacting in third-party content altogether. (*Id.*) Neither is like the simple alternative of just consulting a registry in *HomeAway*. (*Id.* at 12.)

As to the former, Plaintiffs suggest that Google could "monitor a different, much less

---

[7] Plaintiffs argue that *Coffee* should not apply because the court determined the transactions for virtual currency were lawful there, and Plaintiffs here allege they are unlawful. (Opp. at 16.) But the plaintiffs in *Coffee* made the same allegations, and the court correctly found that Google's standalone conduct was lawful. *See Coffee*, 2022 WL 94986, at *3, *6. Plaintiffs' contention otherwise amounts to a bare legal conclusion. *See, e.g.*, *Hodge v. Travel + Leisure Co.*, 2025 WL 327741, at *3 (N.D. Cal. Jan. 29, 2025) (an allegation that is "no more than a legal conclusion" is "not entitled to any weight") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

frequent type of request: those from app developers asking that the Platforms enter into a financial relationship to broker transactions and take a 30 percent cut." (*Id.* at 13.)  But that would still require Google to monitor potentially millions of apps that want to monetize in-app content and, in each case, assess whether the app offers games that involve placing bets or wagers, and how virtual currency may be used within those games.[8]  In any event, less monitoring is still monitoring, and is equally barred by Section 230.  *Calise*, 103 F.4th at 740; *see also, e.g.*, *Yolo*, 112 F.4th at 1181 (holding defendant platform liable for failure to review third-party content would violate Section 230).  As to the latter, ceasing to operate a business is not an alternative to content moderation. Plaintiffs do not point to any authority that suggests otherwise.  (Opp. at 12-13.)  Instead, they rely on *Calise* and *Yolo*, arguing that those cases limit the application of Section 230 to circumstances where "content monitoring and moderation '[is not just] one option in [the platforms'] menu of possible responses; it [is] the only option." (*Id.* at 14 (citing *Yolo*, 112 F.4th at 1177 n.3).)  That is precisely the case here.  Short of no longer transacting in published third-party content entirely, Google's only option to avoid liability is to review the content of every app published on Google Play.  The platforms in *Calise* and *Yolo* could also have upended their businesses and ceased operating, but in neither case did the Ninth Circuit hold that was a viable "option" that precluded immunity under Section 230.  *See Calise*, 104 F.4th at 742–44; *Yolo*, 112 F.4th at 1181–82.[9]

---

[8] Plaintiffs do not attempt to reconcile the tension between their allegations that certain in-app gameplay is lawful (*see, e.g.*, Compl. ¶ 63 (wagering on bingo or making a gift)) with their argument that Google could review on an app-level whether all in-app transactions are legal or illegal "then decide if [it wants] to enter into the relationship." (Opp. at 13.)

[9] Plaintiffs also try to distinguish *Calise*, arguing that, there, Meta received revenue for ads it published on its platform and, here, Google receives revenue for processing a payment.  (Opp. at 13-14.)  But, in both cases, the third-party content the platforms publish—the advertisements in *Calise* and the in-app content here—are what introduce the illegality, and, in both cases, the

In sum, Plaintiffs urge the Court to conclude that Google is liable for offering the same payment processing service here it offers to all apps on Google Play because, in Plaintiffs' telling, by transacting in third-party in-app content, Google supposedly "broker[ed] gambling transactions." (Opp. at 8.)  But, as shown, nothing about Google's independent conduct supports this conclusion or constitutes gambling under the loss recovery statutes.  Instead, only the content of the Third-Party Apps could violate the duties those statutes impose.   Where the "theory underpinning [the Plaintiff's] claims" faults the defendant for providing "neutral features [that] were 'meant to facilitate the communication and content of others' and were 'not content in and of themselves[,]'" even if that facilitation results in illegal activity, the plaintiff's claims "necessarily implicate [the defendant's] role as a publisher" and the defendant is immune from liability. *Doe v. Grindr Inc.*, -- F.4th --, 2025 WL 517817, at *2–3 (9th Cir. Feb. 18, 2025) (quoting *Dryoff v. Ultimate Software Grp.*, 934 F.3d 1093, 1098 (9th Cir. 2019)).  Thus, Section 230 bars Plaintiffs' loss recovery claims.

**2.      Plaintiffs' RICO, consumer protection, and unjust enrichment claims are barred for the same reasons.**

Plaintiffs' only argument as to why their revenue-sharing theory of liability applies to their RICO, consumer protection, and unjust enrichment claims is that those claims can proceed based on the theory that Google participated in unlawful gambling.  (Opp. at 7 ("Plaintiffs argue that what makes the Platforms liable for each of these claims is a violation of exactly the duty the Court identified: not to broker unlawful gambling transactions.").)  This argument fails under Section 230 for the reasons discussed above.  (*See* Section II(A)(1), *supra.*)

Apart from that, Plaintiffs offer no response to Google's explanation for why the duties imposed by these causes of action would require treating Google as a publisher responsible for the content of the Third-Party Apps.  (*See* Mot. at 16-19.)  <u>As to RICO</u>, the underlying duties are to refrain from (1) transmitting wagering information about any sporting event or contests, *see* 18 U.S.C. § 1084, and (2) conducting, financing, managing, supervising, directing, or owning all or

platforms could only avoid liability if they moderate that content. *See Calise*, 104 F.4th at 743–44 ("to avoid liability here, Meta . . . would need to actively vet and evaluate third party ads.").

part of an illegal gambling business, *see id.* § 1955. (*See* Mot. at 16-17.) But, as Google explained, (1) Section 1084 does not apply because no "sporting event or contest[]" is at issue here; and (2) regarding Section 1955, Google does not conduct, finance, manage, supervise, direct, or own all or part of any of the Third-Party Apps or the allegedly illegal game titles within them. (*Id.*) As to Plaintiffs' state law consumer protection claims, those impose a duty to refrain from engaging in deceptive, unfair, and/or unlawful conduct, with the majority more narrowly proscribing deceptive practices, which Plaintiffs allege only as to the Apps, but not as to Google. (*See* Mot. at 18–19; App'x B at Rs. 1–2, 5–9, 11–12.) Again, Plaintiffs offer no response.[10] Finally, as to unjust enrichment, the duty is to return to the plaintiff any benefit that would unjustly enrich the defendant. (*See* Mot. at 19.) *See also, e.g.*, *Calise*, 103 F.4th at 743. Plaintiffs provide no argument as to how Google was unjustly enriched aside from relying on their contention that Google "directly participate[d]" in alleged "gambling," which could only be the case by treating Google as a publisher, responsible for the content in the Third-Party Apps. (*See, e.g.*, Opp. at 5; Section II(A)(1), *supra*.) These claims must all be dismissed under Section 230.

### B.    Plaintiffs Lack Statutory Standing to Bring Their Consumer Protection Claims.

Google expressly joins in and incorporates by reference Apple's arguments in their concurrently filed reply brief that Plaintiffs' state consumer protection law claims should be dismissed.[11] Google additionally offers a response to Plaintiffs' lone state-specific argument

---

[10] "[F]ailure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue." *Linder v. Golden Gate Bridge, Highway & Transp. Dist.*, 2015 WL 4623710, at *3 (N.D. Cal. Aug. 3, 2015) (citation omitted); *see also, e.g.*, *Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1003 n.4 (N.D. Cal. 2024); *Snapkeys, Ltd. v. Google LLC*, 539 F. Supp. 3d 1040, 1050 (N.D. Cal. 2021).

[11] Plaintiffs do not assert claims against Apple under the consumer protection laws of New Jersey and West Virginia (Counts XXV and XLI here), but Apple's arguments apply with equal force to those states' laws. (*See* Apple Reply § II(B); Mot. at 22-23; App'x B at Rs. 9, 11.)

regarding the Kentucky Consumer Protection Act ("KCPA"), given that Plaintiffs assert a KCPA claim against Google, but not Apple.  (*See* Compl. Count XIII.)[12]  As Google previously explained, the KCPA contemplates an ongoing relationship between the consumer and seller not implicated here.  (*See* Mot. at 23.)  Plaintiffs argue that "the purchase of virtual chips is not a one-time transaction between Plaintiffs and Google" (Opp. at 42) and, therefore, falls under the KCPA.  But, in addition to having no basis in any allegation in the Complaint, Plaintiffs' assertion also lacks basis in the law.  Kentucky courts are clear that "the opportunity for gambling" or "the purchase of a lottery ticket" does not create an ongoing relationship between the parties and is, thus, not a good or service covered by the KCPA.  *See Jacobs v. KRM Wagering, LLC*, 2023 WL 3397511, at *5 (Ky. Ct. App. May 12, 2023); *Collins v. Kentucky Lottery Corp.*, 399 S.W.3d 449, 453 (Ky. Ct. App. 2012).  That a plaintiff may *choose* to purchase another lottery ticket (as in *Collins*), to place another wager on a horse race (as in *Jacobs*), or to purchase more virtual chips (as here), does not alter that conclusion.  Plaintiffs offer no authority in response aside from a Northern District of California case, where the proposition cited (addressing what constitutes "goods or services") ***does not even consider Kentucky law***.  (*See* Opp. at 42 (citing *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 2024 WL 4532937, at *41 (N.D. Cal. Oct. 15, 2024)).)

## C.    Plaintiffs Cannot State a Claim Under the Loss Recovery Statutes.

As above, Google incorporates by reference Apple's arguments that Plaintiffs' claims under the state law loss recovery statutes fail.  However, Plaintiffs' Complaint against Google includes causes of action under four states' loss recovery statutes that do not appear in their complaint against Apple—those of Kentucky, New Jersey, Virginia, and West Virginia (Counts XII, XXIV, XXXV, and XL).  Plaintiffs only specifically address three of those four in their Opposition (they do not address Virginia) and, thus, Google provides further argument unique to those three claims.

---

[12] Plaintiffs object to Google's encapsulation of the duties the consumer protection statutes impose, without citation to a single statute or case.  (Opp. at 42.)  Google maintains those create a duty not to deceive consumers (*see* Mot. at 18; App'x B at Rs. 1–2, 5–9, 11–12) but, regardless, Google raised this in its Section 230 analysis and not as a separate basis to dismiss on the merits.

At bottom, Plaintiffs argue that Google has a stake in the games, and is, thus, a "winner," "transferee of a winner," or a "stakeholder" because it loses out on potential revenue if Plaintiffs win in the games and, as a result, choose to make fewer in-app purchases in the future. (Opp. at 21–22.) But all consumer-driven revenues are contingent upon consumers' decisions about whether, and in what quantities, to purchase or repurchase certain products. That does not make revenue from those transactions "winnings" and pointing to this unremarkable fact does not transform the nature of Google's payment processing services for in-app content into gambling transactions in which Google is a winner. Again, Google only: "collects the money players spend on virtual chips," and charges a fee for doing so. (Compl. ¶ 61; *see also* Section II(A)(1), *supra*.) Plaintiffs have placed no "bet" or "wager" with Google, and that transaction yields no "winner."

The authorities on which Plaintiffs rely do not alter this conclusion. In *Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792 (Ky. 2020), a Kentucky court held that an internet-based real-money gambling website called PokerStars was a winner because, although it wasn't a "player" in the game, it took "a percentage of the amounts **wagered on each hand**." (Opp. at 25 (emphasis added).) *See also Triplett v. Seelbach*, 14 S.W. 948, 949 (Ky. Ct. App. 1890) (confirming that a "winner" does not have to be a player but must still take a "certain percent [sic] of the winnings by the actual player," meaning some portion of what is **won in the game**). *Tyler v. Goodman*, 240 S.W.2d 582 (Ky. Ct. App. 1951) is in accord. (*See* Mot. at 24; App'x A at R. 6; Opp. at 25.) There, the court held that Goodman was not a "winner," although he "had some sort of financial interest in the handbook," because he never "accepted any of appellant's bets, or received any of the money lost by appellant." *Tyler*, 240 S.W.2d at 583–84.

In New Jersey, courts have drawn a similar line. Plaintiffs' cited authority makes clear that non-game participants, like a "bookmaker" or a stakeholder, may be liable where they "took bets" or were the individual "with whom both the winning and losing wagers were deposited[.]" (Opp. at 26 (citing *Hensler v. Jennings*, 62 N.J.L. 209, 215 (1898)[13]; *Hartford Acc. & Indem. Co. v. Benevento*, 133 N.J.L. 315, 317 (1945)).) Here, Google has not taken any bets or wagers because

---

[13] *Hensler* addresses a prior version of the New Jersey statute and is no longer instructive.

1    Plaintiffs have placed none when Google processes their payments for in-app content—and, in

2    some cases, they never will.  (Compl. ¶ 63.)  Thus, the circumstances here are more akin to

3    *Humphrey v. Viacom, Inc.*, 2007 WL 1797648 (D.N.J. June 19, 2007), where the court found

4    defendants were not "winners," even though they charged a "set fee" to participate in the games,

5    because their profit was not "in any way dependent on the outcome of [the game]."  *Id.* at *7, *10.

6    (*See also* Mot. at 24.)[14]  Put simply, because the players in *Humphrey* "irrevocably part[ed] with

7    [their] entry fee shortly after they enter[ed] a league[,]" they never "'risk[ed]' . . . losing their entry

8    fee" and the defendant could not be a "winner" for collecting it.  *Id.* at *10.  So, too, here.

9         West Virginia law likewise limits recovery to those with a direct stake in the outcome of a

10    game.  The only case Plaintiffs cite held that a defendant was liable as a winner where he partnered

11    with the gambling room operator, provided "the money to back the games with," and, in exchange,

12    agreed to "share in the profits" from those games.  (Opp. at 28-29 (quoting *Berns v. Shaw*, 65 W.

13    Va. 667, 672 (1909).)  In other words, the defendant only received money when the "house" won—

14    his take was contingent upon the outcome of the games.  The same is not true here.  None of

15    Plaintiffs' cases change the fact that Google's revenue does not depend on any gameplay.  Thus,

16    under no reading of any of the statutes at issue is Google a "winner," and Plaintiffs' claims fail.

17    **III.    CONCLUSION**

18         For the foregoing reasons and those presented in Google's Motion, Google respectfully

19    requests that the Court enter an order dismissing Plaintiffs' Complaint in its entirety.

20

21    _____

     [14] Plaintiffs attempt to distinguish *Humphrey* on the ground that the court there "analyzed only the

22    *qui tam* provision" of the New Jersey statute, which "must be narrowly construed." (Opp. at 26.)

23    But the *qui tam* provision and the provision Plaintiffs rely on here **both** allow recovery from a

24    winner or stakeholder, *compare* N.J. Stat. § 2A:40-6 *with* N.J. Stat. § 2A:40-5, and Plaintiffs have

25    provided no basis—nor could they—to conclude that the same language appearing in two places in

26    the same statute should be differently construed.  *See, e.g.*, *Sullivan v. Stroop*, 496 U.S. 478, 484

27    (1990) (recognizing "the normal rule of statutory construction that identical words used in different

28    parts of the same [statute] are intended to have the same meaning") (cleaned up).

1    Dated: February 26, 2025                    COOLEY LLP

2

3                                                By: */s/ Teresa Michaud*
                                                     Teresa Michaud
4
                                                Attorney for Defendant
5                                               GOOGLE LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW